\*KENNEDY *v.* STATE.

(*Nashville*, December Term, 1946.)

Opinion filed June 26, 1947.

Designated for Publication April 15, 1948.

---

\*Certiorari Denied, 333 U. S. 846, 68 S. Ct. 659, 92 L. Ed. 1129.

Z. Alexander Looby, of Nashville, Thurgood Marshall, of New York City, and Maurice M. Weaver, of Chattanooga, for Kennedy.

Nat Tipton, Assistant Attorney-General, for the State.

Mr. Justice Prewitt delivered the opinion of the Court.

The defendant, Loyd Kennedy, and William Pillow were jointly indicted in the Circuit Court of. Maury County for unlawfully and feloniously committing an assault on the body of Ray Austin with intent to commit murder. On their trial Pillow was acquitted, and Kennedy was convicted of an assault with intent to commit murder in the second degree and his maximum punish-

ment fixed at not more than five years in the penitentiary. He has appealed in error to this Court, and although counsel were present and had the opportunity of orally presenting the case, the record was submitted on briefs.

The record is large, consisting of more than twenty-two hundred pages. About half of the record is devoted to the testimony on a plea in abatement raising the question that no members of the colored race, to which defendant belongs, were on the indicting grand jury. The testimony introduced in support of the plea was preserved by a wayside bill of exceptions. The other half of the record contains the testimony of the witnesses on the facts, and also the testimony touching the fact that there were no Negroes on the petit jury that tried the defendant.

The three principal questions raised are (1) on the facts; (2) failure to order a severance; and (3) racial discrimination in the selection of the grand jury and the petit jury.

This case followed racial disturbances at Columbia in February, 1946. There had been a clash between some members of the two races on the afternoon of February 25, 1946. In this trouble a city policeman was shot, and some members of the State Highway Patrol were sent to Columbia for the purpose of assisting local officers in the restoration of order. After the arrival of the State Patrol, it was decided that at daylight the next morning the patrol would move in and undertake to disarm and arrest persons in the locality of the disturbance. The area was the colored section of the town extending from Main and Woodland Streets and known as Mink Slide. After daybreak on the morning of February 26, the patrolmen, under the direction of Sheriff Underwood, moved

into the area in question. The patrolmen were dressed in their regular uniform indicating their official capacity, and a number of them were armed with machine and riot guns. They proceeded to go and knock on the doors of the establishments in this locality and notify the occupants, if any, to come out and they would not be harmed. This continued without incident until they reached a barber shop owned by Sol Blair. The testimony of the State shows that when they knocked on the door, the patrolmen saw someone in the shop and noted that this person was armed with a shotgun.

Five witnesses for the State testified that at least one shot was fired toward the patrolmen from the inside of this building. The shot struck and wounded Austin, one of the highway patrolmen. The patrolmen returned the fire and entered the building. The back door of the shop was locked. In a shower stall at the back of the shop, they found the defendant crouched against the wall with a single-barreled shotgun at his side. This gun contained an empty shell which apparently had been recently discharged. Pillow, who was acquitted, was found crouched down on the floor under some cover. A double-barreled shotgun was also found in this building when the officers entered. This gun was empty but two exploded shells were found on the floor. One or two shotgun shells were also found on the person of both the defendant and Pillow, and a sack of shells was found in the barber shop.

The defendant testified that he was employed at the barber shop and had a key thereto and that he often slept there at night; that after he had been to a Negro night club, about midnight that night he went to the barber shop and let himself in and found Pillow there; that after he recognized Pillow, whom he knew, he prepared a pallet

and went to sleep and that the first thing he knew he was aroused by the officers firing into the shop. He further testified that he fired no shots and that to his knowledge no shots were fired at the officers from the inside of this building.

Pillow testified that he had gone into this section about nine-thirty at night and that while he was there and just before he was ready to go home there was some shooting in his proximity and he thereupon stepped into this barber shop, the door being unlocked, and sat down at a table in the rear; that many shots were fired during the night and he was afraid to leave; that he spent the night there and knew when the defendant came in about midnight. He denied that he fired any shots or that he saw defendant fire any.

The defendant insists that the evidence preponderates in favor of his innocence.

 We find no merit in this contention. While no witness saw the defendant fire any shots, yet he was seen with a gun and a discharged gun was found near him after the shooting. The number of empty shells found in the gun and on the floor indicates that three shots had been fired, and the jury might well have concluded that with this single-barreled gun so near to the defendant, he had fired it, and even though they declined to convict Pillow, they could have found that the defendant had fired on the patrolmen. The conflict as to the number of shots fired from the inside of the shop may have led the jury to conclude that Pillow was not guilty because of his frightened condition when arrested by the Sheriff and because of a good reputation proven for him on the trial. The defendant maintained a defiant attitude during the trial, and the jury might have concluded that this atti-

tude existed on the morning of the assault. The preponderance of the evidence is that the shots were fired from the inside of the shop, and before any shots were fired by the patrolmen. It is next insisted that the court erred in not holding that the defendant was discriminated against by the exclusion of Negroes from the grand jury.

On the hearing of the plea in abatement, the defendant introduced a number of witnesses whose testimony is that in their memory and for the last fifty years, no Negro had served on either the grand or petit jury in Maury County. The State's evidence showed that Maury County operated under a jury commission law; that the jury commissioners for the county met in July, 1944, and that they then filled the jury box by taking names from the 1943 tax books; and that these tax books contained no identifying symbols whereby the race of any taxpayer might be known. The evidence further showed that at the February 1946 term of court, at which the defendant was indicted, there was drawn from the jury box a list of one hundred and nine names to be summoned for jury service at that term of court. Of these one hundred and nine names so drawn, ten are shown to belong to the colored race. The record discloses that two of those so drawn of the colored race had died in the *interim* between July, 1944, when their names were put in the box, and the date of their being summoned for jury service; that one had removed from Maury County; and that two were actually summoned and excused at their own request. The record fails to disclose what became of the other five.

The State concedes that a presumption of discrimination can arise from a showing that no Negroes have either been summoned for jury service or have served on grand juries for so long a period of time as to give rise

to the belief that the failure is deliberate rather than accidental, but the State insists that such a presumption must yield to the undisputed facts when the question of discrimination is raised. There is no contention made of disproportionate representation of the Negro race on these panels, but the claim made is that of an utter absence of such representation.

In *Norris* v. *Alabama*, 294 U. S. 587, 55 S. Ct. 579, 79 L. Ed. 1074, 1077, the evidence showed an apparent tampering with the list from which the jury had been selected so as to evidently substitute the names of several Negroes upon such list for members of the white race. In that case the excerpt relied upon by the defendant shows that no names of Negroes were placed on the jury roll. In the present case the testimony shows that the names of ten Negroes were placed on the jury list.

In *Akins* v. *Texas*, 325 U. S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692, it was held that where the jury commissioners placed the name of one Negro on a panel of sixteen from which the grand jury should be drawn, this fact evidenced an intent not to discriminate against members of the colored race.

■■ It should be borne in mind that members of the Negro race have no constitutional right to trial by a mixed racial jury. All that they have is a right that their race shall not be discriminated against in the selection and drawing of grand juries. The testimony of the jury commissioners is to the effect that when they placed the names of seven hundred and fifty or more taxpayers in the jury box for subsequent drawing, they were not aware as to the race of a great many of the persons whom they placed therein, but undertook to select a proportionate number of such persons from the various civil districts

318

of the county without regard to their race. That this must be true is evidenced by other testimony in the record. A Negro teacher called by the defendant testified that he was summoned for jury duty at a time previous to the impanelment of the grand jury that indicted the defendant and was excused from jury service at his own request. The evidence further shows that at the November term 1946, at which defendant was tried, one Negro appeared for jury service and was present awaiting such until the entire panel of some fifteen members was excused by the trial judge. The evidence also shows that one member of the colored race, Henry McGlothlin, was on a list of jurors drawn from the jury box in drawing a panel to select the petit jury for the trial of this case. The proof shows that these names which were drawn from the box were placed therein by the jury commission in July, 1944, or more than a year and a half before the commission of the alleged crime in this case.

This brings us to the question of a severance. The bill of exceptions does not contain the motion for a severance nor was it preserved in the lower court, and none of the evidence upon which a severance was sought was incorporated in the bill of exceptions. It is necessary that the evidence be preserved by bill of exceptions. The trial court's action upon an application for a severance requires him to consider the testimony and use his discretion. A severance generally rests within the discretion of the trial court. *Woodruff* v. *State*, 164 Tenn. 530, 51 S. W. (2d) 843; *Thompson* v. *State*, 171 Tenn. 156, 101 S. W. (2d) 467.

The principal reason urged for the allowance of a severance was that the State would introduce in evidence the statement of a codefendant. The Trial Judge

expressly instructed the jury that such statement should not be considered and must not be considered by the jury against any defendant other than the one making it. We think this was sufficient and find no merit in this contention.

█ It is next insisted that the lower court erred in overruling the motion to quash the panel of the petit jurors upon the ground of unlawful discrimination against members of the colored race. The record shows that from the jury box there were drawn forty-six names for the petit jury in this case, and that later the Trial Judge declared an emergency and directed the summoning of twenty-six additional veniremen or a total of seventy-two in all. Of these thirteen were summarily discharged by the trial court for ineligibility, ill health, and other valid reasons, leaving fifty-two who were actually examined as to their qualifications. Four of the fifty-nine were members of the colored race. This shows that there was no discrimination. See *Akins* v. *Texas, supra*. We do not think that the trial court erred in declining to quash this panel.

█ The next insistence is that the Trial Court erred in unduly restricting counsel for the defendant in their examination of prospective jurors. The Trial Judge has a wide discretion in these matters, and his action will not be disturbed unless there has been an abuse of this discretion. No such abuse of discretion appears here. *Foute* v. *State*, 83 Tenn. 712.

█ It is further insisted that the Trial Court erred in admitting the statement of Pillow, a codefendant, containing incriminating facts against the defendant. The Trial Judge instructed the jury not to consider this state-

ment as affecting the defendant's guilt or innocence, and we think this was sufficient. *Thompson* v. *State, supra.*

It is also further insisted that the Trial Court erred in holding the Juror Loftin a qualified juror. This juror's testimony showed that he was uptown in Columbia on the night preceding the shooting but not near the scene of the shooting. He stated on his *voir dire* examination that he would give more weight to the testimony of people he had known all his life than to others he had never known. Mr. Loftin, however, in response to questions by the Trial Judge immediately following this statement, stated that he would follow the instructions of the Trial Judge with reference to weighing the testimony heard by him if selected as a juror; and in response to a question by counsel for defendant, made the statement that the race of the witnesses would cut no figure with him in weighing their testimony. We think he was a qualified juror.

The insistence is also made that the Trial Court erred in allowing one of the highway patrolmen to testify that when the shots were fired from this building, others were struck besides Austin, upon whom the indictment alleged the assault to have been made. We think this was a part of the *res gestae* and therefore admissible. *Mays* v. *State*, 145 Tenn. 118, 238 S. W. 1096.

All the assignments of error have been considered and are overruled.

We have carefully considered this record and conclude that the defendant had a fair and impartial trial, and the judgment of the lower court is affirmed.

CHAMBLISS, C. J., and NEIL and GAILOR, JJ., concur.

TOMLINSON, J., being County Attorney of Maury County at the time of this occurrence, did not participate.