WILLIAMSON *v.* STATE.

*(Jackson,* April Term, 1952.)

Opinion filed June 7, 1952.

Petition to Rehear denied July 11, 1952.

342

J. EMMETT BALLARD and HUGHIE RAGAN, both of Jackson, for defendant.

NAT TIPTON, Assistant Attorney General, for the State.

Mr. Justice Prewitt delivered the opinion of the Court.

The defendant Eugene Williamson, a colored man was found guilty of murder in the first degree in the slaying of L. E. Roper and his punishment fixed at thirty years imprisonment.

The killing took place on the church grounds at Belmont Church, situated in the northwestern part of Fayette County near the village of Braden, which lies just south of U. S. Highway 70. The colored people in that community were having a picnic on the church grounds; sandwiches and cold drinks were being served and sold. The shooting took place at the picnic in July, 1949 about 9 o'clock p. m. At about this time the affair was in full sway and a crap game was in progress nearby.

It seems that a Negro had broken jail some time before at the county seat of Somerville and Sheriff Buck Graham, accompanied by the deceased Roper and Mr. Graves, another deputy sheriff, went to the picnic scene in search of the escaped prisoner. When they reached the picnic grounds, they circulated in a crowd of Negroes. A short time after the officers arrived, an unidentified Negro on a horse rode down the road near the crap game and gave the alarm that the officers had come. The participants in the game scattered and a short time thereafter this killing occurred. Two shots were fired, then two more and then a fifth shot. Officer Graves was nearest the deceased on the opposite side of the automobile from

him. He ran towards Mr. Roper but when he arrived he found the latter lying on his back in a dying condition. He died in a few minutes. His body was taken to Somerville and examined by a physician. One shot had entered the forehead and another struck the corner of the mouth. At the back of deceased's neck a bullet was found lodged under the skin. It was removed and preserved for a ballistic test. Following the killing, two or three colored people were arrested in connection with the killing but were discharged on account of insufficient proof.

Four or five days after the shooting, Mr. Welch, a magistrate at Braden, received information from an unknown person whose name he declined to give, having promised secrecy, that another Negro had made the statement that he had seen the defendant with a pistol threatening to kill the officers because they had broken up the crap game. Mr. Welch immediately called Sheriff Graham, who with some highway patrolmen drove to Braden to see Mr. Welch. After having received this information from the magistrate, the officers went to the home of the defendant. When they reached his home the defendant was lying asleep in the doorway of his room and upon seeing the officers, his wife aroused him and he started towards the back of the house; and seeing the officers were there as well, he came out of the house and was placed under arrest by the officers.

The officers then proceeded to search the house and found a .38 caliber pistol on top of a chifferobe in the room occupied by the defendant, and in a drawer in the same room found a box of .38 cartridges. The pistol and cartridges and also the bullet taken from the body of Mr. Roper were sent to the ballistic place connected

with the Arkansas State Police at Little Rock. The witness Mr. Templeton, an expert in that department, testified that he fired several shots from the pistol taken by the officers and made a comparison of them with the bullet taken from the body of the deceased, and he gives as his opinion, demonstrated by photographs in the presence of the jury, that the bullet taken from the body of the deceased was fired from the particular pistol and from a particular cylinder in it.

The principal witness for the state is an illiterate, ignorant colored man by the name of Jack Puitt. He testified that he saw the defendant with the pistol in his hand fire some shots in the direction of Roper and that he then ran. It is to be noted that this witness was of a very limited intelligence but his testimony to a large extent does possess the ring of truthfulness.

The defendant admits being present at the scene of this picnic and operating one of the dice games which was going on, but denies any connection with the homicide. He testified that at the time the shots were fired, he was standing at a stand which was erected on the grounds and after the shooting, went home. A Negro preacher testified that he went to the cotton field to interview the witness Puitt and the latter told him that he had not seen the shooting. Some other Negroes testified that on this particular night, Puitt was engaged in a crap game with them some distance from the picnic. These witnesses contradict each other upon cross examination and it is shown that one of them told officer Graves that it was Saturday night instead of Friday when Puitt was at this place.

Even though the witness Puitt had but little intelligence, his statement that he saw the defendant fire at

the deceased is very definitely corroborated by the ballistic test. The defendant denies all knowledge of the ownership of the pistol found on the top of the chifferobe in his room but does admit the ownership of the box of cartridges which would fit the pistol and which was also found in the same room.

■ As to whether or not the jury should believe Puitt and his corroboration arising from the ballistic test, or the witnesses testifying on behalf of the defendant, was a matter exclusively for that body. It might be here observed that two juries of Fayette County have passed upon Puitt's testimony and saw proper to believe his statements. The question involved is one of credibility of witnesses and the verdict should not be set aside by us since merely the test of credibility was presented.

*Turner* v. *State,* 188 Tenn. 312, 219 S. W. (2d) 188.

It might be here stated that some months ago this Court reversed a conviction arising out of this same homicide because no members of the colored race were summoned for jury service.

It is also insisted by the defendant that the indictment should have been abated because of the discrimination against the Negro race in the selection of the panel from which the jury was drawn. Defendant introduced no evidence upon the present trial upon this question. He did introduce his motion to quash the indictment but nowhere made reference to testimony made upon that matter on the former hearing, and he is here upon his motion unsupported by any testimony.

■■ An appellate court will not examine testimony on a former hearing unless it be incorporated into the hearing on the second appeal. *MacIntyre* v. *Albers,* 175

Minn. 411, 221 N. W. 526; *Taylor* v. *Northern States Power Co.*, 196 Minn. 22, 264 N. W. 139; *Wickum* v. *Arneson*, 63 N. D. 594, 249 N. W. 709. In *American National Bank* v. *Bradford*, 28 Tenn. App. 239, 188 S. W. (2d) 971, it was held that the former opinion of the Court of Appeals could not be relied upon to sustain a plea of res judicata unless the same were made a part of the transcript.

 It is also insisted that there was a discrimination against the defendant from the panel from which the trial jury was taken. Records show there were summoned for jury duty eighteen to twenty Negroes out of a total panel of 152 summoned for this purpose. The record shows that the trial jury was composed of eleven whites and one Negro.

The testimony of Mr. Welch, one of the jury commissioners, was as follows:

"Q. Now for some time I'll ask you if you and other members of the commission have been placing names of men that you knew were members of the colored race in that box? A. Yes for the last, I'd say year and a half.

"Q. In other words you have been doing it that long constantly? A. Yeh.

"Q. Squire will you tell the court approximately how many names, the names of how many negroes were in the box at the beginning of this July term of court? A. To my knowledge there were twelve or fifteen names.

"Q. Have you endeavored to select the same number of colored folks in proportion to the population as there are to the whites on the jury? A. We never made any selection of so many colored people and so

many of the white people we just put a good many names of the colored people in there and a good many names of white people.

"Q. Well in order to get the colored names in there you checked on certain colored folks in order to locate that—see whether or not you knew a colored man that would make a good juror and such as that, that's the method you used? A. That's right because the majority of the colored people are not, I don't think, qualified for jury service.

"Q. How many did you put in there? A. Personally?

"Q. Yes sir. A. I put about 8 or 10.

"Q. 8 or 10? A. 7, 8 or 10."

In a comparatively recent case, *Kennedy* v. *State,* 186 Tenn. 310, 210 S. W. (2d) 132, we held that where no Negro had been called for jury service, this raises a presumption of discrimination but the presumption yields to evidence as to what was actually done. In the present case, the number of Negroes summoned for jury duty was sufficient to have chosen an all Negro jury after making allowances for six peremptory challenges allowed the state. In *Kennedy* v. *State*, supra, the number of Negroes summoned for trial jury duty was four out of a total panel of 59. This Court held that adequate to evidence nondiscrimination. The Supreme Court of the United States denied certiorari in the *Kennedy case,* 333 U. S. 846, 68 S. Ct. 659, 92 L. Ed. 1129.

The defendant insists that he was entitled to proportionate representation and that the jury panel should have been directly proportionate to the respective number of Negroes and whites residing in Fayette County.

In *Atkins* v. *Texas,* 325 U. S. 398, 65 S. Ct. 1276,

89 L. Ed. 1692; *Patton* v. *Miss.,* 332 U. S. 463, 68 S. Ct. 184, 92 L. Ed. 76; and *Cassell* v. *Texas,* 339 U. S. 282, 70 S. Ct. 629, 94 L. Ed. 839, it was held that there is no right to such proportionate representation but all that is required is that there exists no discrimination by reason of race.

■ It is next insisted that it was error to permit the officers to testify as to the finding of the pistol in the home of the defendant, the insistence being that it was procured by unlawful search. We think that the officers had this information of the commission of a felony and no search warrant was necessary.

*Stone* v. *State,* 161 Tenn. 290, 30 S. W. (2d) 247; *Jones* v. *State,* 161 Tenn. 370, 33 S. W. (2d) 59; *Vaughn* v. *State,* 178 Tenn. 384, 158 S. W. (2d) 715.

■ ■ We have considered all the assignments of error and find them without merit. We think the evidence does not preponderate in favor of the innocence of the accused and the jury was warranted in believing the testimony of the witness Puitt, especially when taken into consideration with the ballistic test as to the bullet and the pistol, and the further circumstance that the defendant denied any knowledge of the pistol which was found in the room occupied by him. The judgment must be affirmed, with the modification that the sentence be thirty years in the state prison instead of a sentence of not exceeding thirty years as the indeterminate sentence law does not apply.

### On Petition to Rehear.

A petition to rehear has been filed herein but it seeks to reargue matters fully argued upon the original hearing and to raise the same questions there stressed.

350

█ Under these circumstances, the Court will not entertain the petition.

*Messer* v. *Reid,* 186 Tenn. 94, 208 S. W. (2d) 528. *Clouse* v. *Garfinkle,* 190 Tenn. 677, 231 S. W. (2d) 345.

It results that the petition must be denied.