**STATE of Tennessee, Petitioner,**

v.

**James Thomas JEFFERSON, Respondent.**

Supreme Court of Tennessee.

Aug. 18, 1975.

Rehearing Opinion Nov. 10, 1975.

R. A. Ashley, Jr., Atty. Gen., William C. Koch, Jr., Asst. Atty. Gen., Nashville, for petitioner.

Avon N. Williams, Jr., Nashville, for respondent.

## OPINION

PER CURIAM.

Certiorari was granted in this case for the sole purpose of reviewing the limited remand ordered by the Court of Criminal Appeals in the opinion prepared by Presiding Judge Walker.

After carefully reviewing the record, it is the judgment of this Court that the Court of Criminal Appeals has correctly dealt with all issues. The judgment of the Court of Criminal Appeals is therefore in all things affirmed and the case remanded to the Criminal Court of Davidson County for an evidentiary hearing as ordered by the Court of Criminal Appeals.

The opinion of the Court of Criminal Appeals will be for publication as an appendix to this opinion.

Affirmed and remanded.

## APPENDIX
## OPINION

WALKER, Presiding Judge.

In four indictments the Davidson County grand jury on July 23, 1968, charged the defendant below, James Thomas Jefferson, with (1) first degree murder of John Robert Bolte; (2) rape of Barbara Bolte; (3) assault with intent to murder Barbara Bolte; and (4) assault with intent to murder Dara Bolte, the 18-month-old daughter of John Robert and Barbara Bolte.

Jefferson was first tried for the rape of Mrs. Bolte. That trial commenced October 28, 1969, and ended December 20, 1969, when a mistrial was declared because the jury was unable to agree on a verdict.

In this case he was tried for the murder of John Robert Bolte. Selection of the jury began January 18, 1971, and was completed February 17, 1971. Presentation of proof began February 18, 1971, and on March 5, 1971, the jury found the defendant guilty of murder in the first degree and fixed his punishment at 99 years in the penitentiary. Jefferson appeals in error from this conviction and sentence.

The bill of exceptions contains almost 10,000 pages, with 42 volumes of testimony heard on the selection of the jury and 27 volumes of trial testimony.

We find that the case must be remanded for a hearing on the plea in abatement and for hearing on the procedure used to select prospective jurors in this case. We have carefully examined all of the other assignments of error and find them to be without merit for the reasons we state here.

We first consider the defendant's contention that the court erred in refusing to quash the indictment. It charges that the defendant:

" . . . (U)nlawfully, feloniously, willfully, deliberately, premeditatedly and maliciously, or in the perpetration of or while attempting to perpetrate a rape, robbery, burglary or larceny, did make an assault with an axe upon the body of one John Robert Bolte, and he the said John Robert Bolte (sic), he the said James Thomas Jefferson, then and there did unlawfully, feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought, or in the perpetration of or while attempting to perpetrate a rape, robbery, burglary or larceny, kill and murder, against the peace and dignity of the State of Tennessee."

The defendant says the indictment is duplicitous and vague in that it fails to apprise the defendant of the specific offense of which he is charged; that the allegations are repugnant and in a single count there are charges of alternative offenses.

Generally, two distinct offenses cannot be charged in the same count of an indictment. *Forrest v. State,* 81 Tenn. 103; *Wynne v. State,* 45 Tenn. 319. TCA 40–1806, however, provides:

"40–1806. Alternative allegation of means or intent.—When the offense may be committed by different forms, by different means, or with different intents, such forms, means or intents may be alleged in the same count in the alternative."

If an indictment in one count charges a defendant with only one offense although it charges different means, not repugnant, it is valid. See *Davis v. State,* 194 Tenn. 282, 250 S.W.2d 534; *Griffin v. State,* 109 Tenn. 17, 70 S.W. 61. This indictment charges the defendant with one offense, the first degree murder of John Robert Bolte although it charges different means or intents with which the crime was committed. The means and intents are not repugnant.

The defendant also alleges in the motion to quash that the felony murder charge is vague and indefinite because it specifies four separate offenses without indicating the identity of the victims or the circumstances of the perpetration of the crime. We find no merit in this contention. See *Jordan v. State,* 156 Tenn. 509, 3 S.W.2d 159. This indictment is sufficiently clear for the defendant to prepare his defense, for the court to exact the punishment and to protect the defendant from future prosecution for this homicide.

The court did not err in overruling the motion to quash the indictment.

The defendant says the court erred in refusing to permit him to introduce evidence on his plea in abatement and in overruling it.

On August 7, 1968, the defendant filed a plea in abatement alleging that (1) the grand jury which returned the indictment was chosen by a white judge pursuant to Chapter 53, Section 7, Private Acts of 1947, and that no Negro can be elected to the

office of criminal judge in Davidson County; (2) that jury lists for grand and petit juries are prepared by a Board of Jury Commissioners and that no Negro has ever been appointed a jury commissioner; (3) that since 1950 never more than one Negro has served on a grand jury for a single term of court and the judges and jury commissioners have deliberately limited the number of Negroes selected for grand and petit juries, solely on account of their race; (4) the indictment was unconstitutional because it was obtained as a result of an unlawful search and seizure; (5) Sections 4, 5 and 7 of Chapter 53, Private Acts of 1947, violate the Tennessee and Federal Constitutions.

■ The trial judge properly held no hearing was required on the allegations that the grand jury was selected by a white judge and that no Negro can be elected to that office. The mere absence of a black criminal judge is not evidence of systematic exclusion in the selection of grand juries. The same rule applies to the allegation that no Negro has been appointed a jury commissioner. The greatest strictness prevails in the construction and application of pleas in abatement. They must possess the highest degree of certainty known to the law in every particular. *Chairs v. State,* 124 Tenn. 630, 139 S.W. 711. These allegations about the white judges and white jury commissioners do not meet the requirements for an evidentiary hearing.

The trial judge granted a hearing on the search and seizure question but overruled all other allegations of the plea in abatement.

■ In attacking Chapter 53 of the Private Acts of 1947, the defendant specifically urges that sections 4, 5 and 7 are unconstitutional because they vest (1) discretion in the criminal court judge to select jurors contrary to the general law of Tennessee and make possible systematic discrimination against Negroes in selection of juries and (2) the standards to be used are vague, subjective and indefinite so that the judges

have complete discretion in selection of juries as to racially discriminate. He alleges that such discrimination occurred in the grand jury that indicted him.

The Private Act of which the defendant complains has been challenged in other cases. It has been held constitutional and indictments returned by grand juries selected under it have been held valid. *Canady v. State,* 3 Tenn.Cr.App. 337, 461 S.W.2d 53; *McQuiddy v. State,* Tenn.Cr.App., Nov. 1968 (unreported).

■ *Flynn v. State,* 203 Tenn. 337, 313 S.W.2d 248, discusses the constitutionality of the Private Act controlling grand jury impaneling in Shelby County. That Private Act is similar to that governing the selection of Davidson County grand juries. *Flynn* held the provisions of TCA 40–1501 directory and not mandatory; that the impaneling of the grand jury as was done there constituted a de facto grand jury at least. In the absence of fraud or prejudice, the indictments of a de facto grand jury are as valid as those presented by a de jure grand jury.

■ The defendant also challenges the constitutionality of the Private Act alleging that the standards to be used are vague, subjective and indefinite so that the judges have complete discretion in the selection of juries as to racially discriminate. He specifically challenges the requirement that the jurors be "upright and intelligent men of fair character and sound judgment."

In *Carter v. Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549, the Alabama statute was challenged which statute required jury commissioners to select for jury service those persons who are "generally reputed to be honest and intelligent and . . . esteemed in the community for their integrity, good character and sound judgment . . . ." The United States Supreme Court held this statute constitutional:

"It has long been accepted that the Constitution does not forbid the States to

prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character."

The statute before us is substantially the same as the Alabama statute and the requirement that jurors be "upright and intelligent men of fair character and sound judgment" is proper. The trial judge correctly denied the plea in abatement on that ground without an evidentiary hearing.

We now turn to the allegations of the plea in abatement that the judges and/or jury commissioners have deliberately limited the number of Negroes selected for grand and petit jury service solely on account of race. The state contends that these allegations are conclusory, but we think they merit consideration.

In overruling this ground of the plea in abatement, the trial judge held that there is no racial discrimination in the selection of grand and petit jurors in Davidson County; that two Negroes served on the grand jury during the term at which Jefferson was indicted and one was ill the date of the indictment and a substitute juror appointed for him; that the court had previously ruled in *State v. Walden* and *Givens* that there is no systematic exclusion of Negroes from grand juries in Davidson County. The state also relies on the unreported case of *Allen v. State,* Tenn.Cr.App., October 1972, in which this court found no systematic exclusion of blacks in Davidson County. We do not think that the decisions of those cases foreclose the defendant in his attempt to prove systematic exclusion.

The state also says that the plea in abatement was not timely filed and therefore, for that reason, should be dismissed. Jefferson was arrested July 1, 1968, indicted July 23, 1968, and he filed his plea in abatement August 7, 1968.

 A number of our cases hold that a plea in abatement must be filed at the earliest possible time and that after this length of time it is too late. *Chairs v. State,* supra; *Gray v. State,* 194 Tenn. 234, 250 S.W.2d 86; *Dietzel v. State,* 132 Tenn. 47, 177 S.W. 47. We do not think this plea should be dismissed as untimely filed. See *Bonds v. State,* 220 Tenn. 555, 421 S.W.2d 87; *State v. East,* Tenn.Cr.App., 485 S.W.2d 881.

We, therefore, hold that the plea in abatement should be heard on the issue of systematic exclusion of Negroes from grand and petit juries.

 The trial judge properly denied the defendant's "Motion to Require Inclusion of a Reasonable Cross Section of Negro Citizens on the Jury Venire" in which the defendant moved the court to ensure that the jury venire would be composed of no less than 19 percent Negro citizens. A defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the jury roll from which petit jurors are drawn. Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

 We find no merit in the defendant's contention that the jury should have been drawn in accordance with TCA 22–223 through TCA 22–242 rather than the Private Act applying to Davidson County.

Section 4 of the Private Act requires the jury commissioners to select from tax books, permanent registration lists and poll books of the county, and any other source available, the names of upright and intelligent men of fair character and sound judgment to be eligible for jury service. Section 5 provides that the board shall unlock Jury Box No. 1, break the seal, shake the box, and cause to be drawn from the box names, by a child under ten years of age, or by a blindfolded person. Section 9 provides that when a judge is satisfied that a jury in

cause pending cannot be obtained from the number of persons ordinarily summoned, he may cause to be drawn from the jury box in open court such number of names he deems sufficient and the sheriff shall summon those persons; and from those persons the jury shall be made up, if practicable; if not, another number of names shall be drawn in the same manner and summoned instanter until the jury is completed.

The Act was amended by Chapter 329, Section 20–A, Private Acts of 1967, which authorizes an alternate method of providing names for jury venires. In the event the judges find that the roll of all registered voters is so tabulated that names can be selected mechanically or electronically as to assure proportionate distribution of names selected, then the judges may authorize the jury commission to obtain names for jury venires from such source and by such method.

The Private Act with its amendment applies to Davidson County and therefore the defendant's contention that the general law was not complied with is without merit.

■ The defendant made several motions, both oral and written, pertaining to various aspects of the selection of the jury. On January 18, 1971, he filed a "Motion to Quash Jury Venire and Challenge to the Array," by which he charged there was an insufficient number of Negroes on the jury venires. On February 4, 1971, he filed a "Challenge to the Array, Motion to Quash the Jury Venire, Motion to Discharge all White Jurors tentatively accepted thereunder and to Restore all Peremptory Challenges to Defendant." He alleged that the IBM cards from voter registration rolls and from Nashville Electric Service were discriminatory and that the cards were improperly drawn from the jury box. He contended the use of a computer was illegal.

The trial judge denied these motions without hearing evidence offered. Apparently evidence was heard at the former trial on these allegations of discrimination but we do not have that evidence before us. We think that the defendant's allegations that blacks were systematically excluded from the petit jury panels by the use of a computer requires a hearing. On the remand ordered, the defendant may present evidence on this claim.

■ The defendant alleges that blacks represent 19 percent of those eligible for jury duty and 16 percent of those summoned and reporting here were black. This difference alone would not show systematic exclusion. Of the 785 jurors called, 751 are identifiable by race. Of those whose race is known, 621 were white and 130 black. Of the jurors whose race is known, more than 17 percent are black.

■ For the first time the defendant says women were discriminated against in the petit jury rolls. One hundred and 66 women were called. We find no merit in that contention.

■ The special venires were drawn in open court by a blindfolded person in the view of the trial judge. We think there was nothing improper in the procedure followed in drawing the jurors names in open court in the presence of the trial judge and that no hearing was required on the defendant's statements about the way names were being drawn in open court.

By several assignments of error, the defendant challenges the voir dire examination of the jury. He contends the trial court unconstitutionally restricted his counsel by (1) requiring collective voir dire of the jury; (2) refusing to permit effective interrogation on racial attitudes and prejudice; (3) denying challenges for cause based on attitudes or living conditions of jurors reflecting racial prejudice, arbitrary prejudice in favor of police officers, preformed opinions and other prejudicial matters.

The defendant claims that the collective examination of prospective jurors was prejudicial and unconstitutional. By the procedure used by the trial court, twelve jurors

were called and examined, after which the prosecutor exercised his challenges for cause and as many peremptories as he desired. Anyone excused was immediately replaced so that the prosecutor then tendered twelve jurors to the defendant who likewise exercised his challenges. The process would be repeated. Jurors were only tentatively accepted and were actually examined individually at great length on their qualifications although twelve jurors were always in the box.

■ The trial judge has wide discretion in the examination of prospective jurors and his action will not be disturbed unless there is an abuse of that discretion. *Kennedy v. State,* 186 Tenn. 310, 210 S.W.2d 132, cert. denied 333 U.S. 846, 68 S.Ct. 659, 92 L.Ed. 1129; *Vines v. State,* 190 Tenn. 644, 231 S.W.2d 332; *Lindsey v. State,* 189 Tenn. 355, 225 S.W.2d 533; *Solomon v. State,* Tenn.Cr.App., 489 S.W.2d 547; *Layman v. State,* 1 Tenn.Cr.App. 83, 429 S.W.2d 832. The mode of exercising challenges, as well as the order of challenge, rests within the sound discretion of the court. *Estep v. State,* 193 Tenn. 222, 245 S.W.2d 623. We have approved the procedure used by the trial judge here. *Lang v. State,* 3 Tenn.Cr.App. 108, 457 S.W.2d 882, cert. denied 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826. This is the prevailing state practice. See ABA Standards Relating to Trial by Jury, Section 2.6, Peremptory Challenges. The trial judge did not abuse his discretion.

■ The trial court permitted the defendant to examine prospective jurors at great length on their racial attitudes in an effort to determine whether or not they were biased. He allowed broad inquiry into any question of partiality on race or other matters. He correctly held that some questions the defendant proposed were not relevant.

In *Smith v. State,* 205 Tenn. 502, 327 S.W.2d 308, cert. denied 361 U.S. 930, 80 S.Ct. 372, 4 L.Ed.2d 354, rehearing denied, 361 U.S. 973, 80 S.Ct. 585, 4 L.Ed.2d 552, our Supreme Court said:

". . . A voir dire examination is for the purpose of advising counsel of the juror's qualification, interest, or bias, as a matter of fact, presupposing his statutory competence, that is, age, residency, etc. The subjacent purpose is to enable the exercise of one's peremptory challenges. *Leach v. State,* 31 Ala.App. 390, 18 So.2d 285. In this process, it has been held, and it seems to us fairly so, that proper fields of inquiry include the juror's occupation, habits, acquaintanceships, associations and other factors, including his experiences, which will indicate his freedom from bias."

The trial judge did not abuse his discretion in the examination of the prospective jurors.

■ The defendant complains of the court's action in restricting interrogation of jurors on capital punishment and summarily granting state challenges without his interrogation. Examples of questions he cites he was entitled to ask are: Would you be more likely than not to impose capital punishment? Do you believe that capital punishment should be more frequently in cases involving black sex offenders against white? Do you believe a racial differential should be applied with reference to the imposition of the death penalty more often with black defendants than with white defendants?

The jurors dismissed for cause did not meet the test laid down in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. That case does not apply unless the jury returns a sentence of death. It did not do so here. The questions the defendant sought to ask would not show that a "death-oriented" jury is "prosecution prone." Each juror stated that a finding of guilt or innocence would be completely independent of a decision on punishment. Each juror said he had no racial prejudice and would view the case on its merits and without regard to color.

■ The case was tried before *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. The defendant says since our capital punishment statute is unconstitutional the state was allowed 23 additional peremptory challenges on the ground they would not consider the death penalty. We find no merit in this argument.

The trial judge applied the rules even-handedly and there was no error in the examination and qualification of jurors on capital punishment.

■ The defendant was not entitled to a bifurcated trial on guilt and punishment as he insists. *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711. We likewise see no error in the clerk's inquiry of jurors as to their relationship with any of the parties.

■ The defendant complains that the clerk asked jurors whether they had an opinion of innocence as well as guilt and that the disqualification of those who expressed an opinion of innocence without further interrogation was unconstitutional. He contends the court erred because a belief that the defendant was innocent is based on the presumption of innocence.

When jurors were called, the clerk inquired: "Have you formed or expressed an opinion as to the guilt or innocence of this defendant, James Thomas Jefferson, charged with murder, being represented by Mr. Avon Williams?" If the prospective juror answered, "no," the clerk asked further questions. If he replied "yes," the trial judge would question the venireman as to whether he could set the opinion aside, listen to the evidence testified to from the witness stand and base his verdict upon that evidence and that evidence alone. If he said "no," the judge excused that juror.

On five occasions the prospective juror did not answer that question but gave his opinion. Juror Leroy Payne answered, "In my opinion I'd have to say he's guilty." He was immediately excused by the court and the jury told to disregard the statement.

To the same question, Juror Carl Reed replied, "Not guilty." The court asked if he had already expressed an opinion and Mr. Reed replied that he had. The court thereupon excused him and told the jury to disregard his opinion. Matthew Resha was asked this question and replied, "Of his guilt, yes, sir." He was excused and the jury instructed to disregard this statement. Thomas Anderson replied, "I think this man is not guilty." He was excused with instructions to the jury to disregard this remark. Robert Gray answered, "Yes, I have; I believe that he is guilty." He was likewise excused and the jury told to disregard this remark.

The question in each instance was not whether you believe the defendant is innocent because of the presumption the law gives him. The question was, "Have you formed or expressed an opinion as to the defendant's guilt or innocence?" The answers were not responsive to the question. The court did not want to know what the opinion was. He was justified in immediately excusing the prospective juror who indicated his opinion. If he had allowed the venireman to remain on the panel, either the state or the defendant could have been prejudiced. The trial court did not abuse his discretion in excusing such jurors who expressed an opinion of innocence.

■ By continual threats, interruptions, pressure and disparagement of his counsel throughout the voir dire and the trial, the defendant says the court deprived him of effective assistance of counsel and due process of law.

The defendant was tried by a fair and impartial jury. One black man and one black woman were selected and served. Without foundation defense counsel accused jurors, the court reporter, court attendants and trial judge of racial prejudice.

In a fair and impartial manner, the court directed questions to jurors to determine whether or not they were competent. He explained that the defendant was not required to introduce proof, that they should

give the defendant the benefit of a reasonable doubt and resolve a reasonable doubt in the defendant's favor, that an indictment created no presumption of guilt, that the defendant was innocent as of that time. The defendant's counsel objected to the court explaining these rules to the jury. He frequently insisted that the court was coaching the jurors and objected to the court taking part in the selection of the jury. Several times he called this a "travesty on justice"; said that the court had adopted a procedure designed to help the state convict; that the court was attempting to eliminate blacks and secure a white jury; that the court was biased and was begging white jurors to serve and blacks to get off the jury; that the court was bombarding the jurors about capital punishment. He accused jurors of being willing to say anything the judge told them to say to get on the jury. He badgered jurors and argued with them in an effort to get them to disqualify themselves.

At times the trial judge showed some impatience at defense counsel's unwarranted charges that he was biased and prejudiced and at the defense counsel's tedious and argumentative examination of jurors, but it is clear that the judge's paramount goal was to get a fair and impartial jury within a reasonable time. None of his actions or rulings prejudiced the defendant.

■ Claims of bias are unfounded. The objection to his taking part in the selection of the jury is without merit. That is part of the function of a trial judge. He should take part in the voir dire examination. See American Bar *Standards Relating to Trial by Jury,* Sec. 2.4, Voir Dire Examination. The contention that this violates the federal constitution is meritless. By Federal Rule of Criminal Procedure 24(a), the court has discretion to conduct the examination itself or to permit counsel to do so. The judges in at least 51 federal districts and many state courts conduct all voir dire questioning of jurors. Our practice is more liberal for defendants. If the trial judge did not seek to help the jurors understand their responsi-

bilities, he would have been derelict in his duty. Practicing attorneys would have difficulty in correctly answering some questions propounded to them in this case by defense counsel.

The trial judge was generous in permitting the defendant to proceed at great length in examining prospective jurors. Selection of the jury took about 30 days; the record shows that in the earlier trial five weeks was taken in examining 56 jurors.

Chief Justice Warren E. Burger stated that "John Adams and his reincarnated colleagues would be shocked and bewildered at some of the antics and spectacles witnessed today in the courtrooms of America . . . They would not be able to understand why so many cases take weeks or months to try. No one could explain why the jury selection process, for example, should itself become a major piece of litigation consuming days or weeks." 57 *American Bar Association Journal* 421, 426 (1971).

The defendant had ample time to examine jurors and was given unusual latitude in his questioning. Some jurors were tentatively selected 30 days before the trial began. Under such circumstances a juror may become tired before the trial of a case actually begins.

■ The defendant claims he was denied a fair trial because the trial court improperly held his attorney in contempt of court.

After repeated warnings the court, on Friday, February 5, 1971, held defense counsel in contempt of court, for violation of TCA 23–902(1) and (3), excused the jury, imposed a fine of $10 and a sentence of two days in jail. He then adjourned court until Monday morning, February 8. The trial judge had repeatedly warned counsel before taking this action. It occurred in the examination of prospective juror Carl Reed. The trial judge properly held counsel in contempt of court. Counsel indicated that he would refuse to pay the fine and would remain in jail. Before calling the jury back

into the courtroom to be dismissed over the weekend, the court instructed the district attorneys to make no comment about the case under threat of similar punishment.

Within a few hours, a petition was presented to a member of this court and he granted both certiorari and supersedeas. Defense counsel, however, declined this relief, preferring to remain in jail.

The defendant was not prejudiced by the action of the court in holding his attorney in contempt. All jurors selected said that they were not prejudiced against the defendant or his counsel. Tentatively acceptable jurors were sequestered and any resulting publicity was shielded from them. Prospective jurors questioned afterwards were carefully interrogated about any prejudice they might have against the defendant and his lawyer.

■ The defendant claims that statements of the prosecutor prejudiced him. Out of the presence of the jury, on Monday, February 8, 1971, the district attorney general called attention to the fact that the defendant was present but his counsel refused to be released from jail. He asked the court to order counsel to return and represent his client. The court adjourned court until the next day with instructions for counsel to be in court. These remarks in the absence of the jury were not prejudicial to the defendant.

The trial judge properly denied a motion for a mistrial and to recuse himself.

■ The defendant challenges the weight and sufficiency of the evidence.

The state's proof, which the jury accepted, showed that about 10:15 P.M. on June 14, 1968, John Robert Bolte and his wife, Barbara Bolte, and their 18-month-old daughter, Dara, returned to their home in Nashville after visiting a carnival and undertaking to visit her parents. After putting the baby to bed they watched television. That was the last time she saw her husband alive.

She fell asleep and was awakened by a strange man, whom she positively identified in a lineup and at trial as the defendant. He had a knife in his hand. When she screamed he told her to be quiet or he would kill her. She continued to scream and he stabbed her in the arm, the handle of the knife breaking off and the blade remaining in her arm.

When she continued to call for her husband, the assailant told her, "O.K., I'll take you to that dead son-of-a-bitch." She lost consciousness. On regaining consciousness she saw the defendant throw the cover off the bed in which the body of her husband lay. An axe was nearby and her husband had been fatally struck in the back of the neck. The defendant then struck her in the head with the axe causing her to lose consciousness again.

When she again regained consciousness, the defendant was having sexual relations with her. She observed his features then and at other times while he was in the house. He wore rubber gloves and was in sock feet. She feigned death but heard him taking her husband's watch from his wrist. After Jefferson got the watch, he pulled out dresser drawers and ransacked them. He also struck and wounded the baby with the axe.

The defendant apparently thought Mrs. Bolte was dead. He came into the room several times and turned on the lights. In his left ear Mrs. Bolte noticed something like a hearing aid or the plug to a transistor radio. She observed him carefully both as to his appearance and his dress. Mr. Bolte collected buffalo nickels. This coin collection and his Benrus watch with stainless steel band were later found missing. His billfold and a camera were also missing.

Mrs. Bolte (Mrs. Barbara Bolte Maxey at the time of the trial) regained consciousness the next morning and, although severely injured, was finally successful in calling for an ambulance. Because her throat was cut, she had difficulty in talking. She told the attendant a colored man had broken in and

she thought her husband was dead. She was placed in intensive care at the hospital. The child was also taken to the hospital with her injuries.

At the hospital Mrs. Bolte described her assailant in detail to the police and also described him to an artist who drew sketches according to her description. She approved his second sketch made from her description. That sketch appeared in a Nashville newspaper and led a private citizen, Mrs. Anna Faye Kraft, on June 27, 1968, to recognize the defendant as the man in the drawing. This caused his arrest on July 1, 1968. The description Mrs. Bolte gave officers and the artist was unusually accurate.

Mrs. Kraft, an interviewer for the State Department of Employment Security, notified Lieutenant Bob Hill, of the Metropolitan Police Department, that the defendant had been in her office and that he was very similar to the man in the sketch. She asked that he not be apprehended in the employment office because she did not want a scene there. She gave Lieutenant Hill the defendant's name and the officers examined a 1964 police photograph of the defendant before going to the area of the employment office for him.

When the defendant left the office, Lieutenant Hill identified himself. The defendant asked if this concerned a parking ticket. The officers at that time did not know there was an outstanding traffic warrant against the defendant but later found a capias in traffic court issued against him.

The defendant went to Lieutenant Hill's office voluntarily, and, after *Miranda* warnings, said he had nothing to hide and did not want a lawyer. He agreed to participate in a lineup and signed a waiver of rights. When he was asked to remove the contents of his pockets, this disclosed, among other things, 11 rare buffalo nickels, two Indian head dimes and another person's overseas airline travel card.

The defendant explained his possession of the buffalo nickels by claiming that he purchased them the Saturday before in order to play a pinball machine at a drive-in market at Eleventh Avenue and Charlotte. He also claimed that he spent the nights of June 14 and June 15, 1968, with his girl friend, Claraetta Marsh, at her home. He also gave police permission to search his room at his grandmother's house where he lived, but this search disclosed nothing material to the case.

Evidence at the trial showed that Jefferson did buy a roll of nickels at the drive-in to play a pinball machine. The owner himself saved buffalo nickels and his employees did not permit any of the few received in trade to be delivered to customers in the rolls they prepared. He also purchased rolls from his bank which were sometimes sold unopened to customers to play the machines. The fact that a rare collection of buffalo nickels was taken from the Bolte house and 11 buffalo nickels were found on the defendant was a circumstance for consideration by the jury, along with all the proof.

In a lineup Mrs. Bolte positively identified the defendant as her assailant.

In their investigation officers learned that a short time after the offense the defendant had shown a wristwatch with stretch band to Elvis Pruitt, a fellow employee at Steiner-Liff Textile Waste Company and asked if it was worth $5. He explained that someone had pawned it to him the night before.

On June 24 or June 25, 1968, the defendant asked another employee, Lewis Pitts, if he wanted to buy a watch. The defendant first asked $10 but Mr. Pitts purchased it for $7. Mr. Pitts later turned the watch over to Mr. Currey, an investigator. Mrs. Bolte identified this as the watch taken from her husband.

An examination of the watch showed the name "Bolte" inscribed on the movement in two places and also the letter "B." The watch had been given Mr. Bolte by his father, a resident of Cullman, Alabama.

Mr. Buettner, a jeweler of that city, testified that he had placed the markings on the watch when cleaning it for Mr. Bolte's father and the "B" was his own symbol placed on it according to his custom. He identified the watch as one previously belonging to Mr. Bolte's father. Mr. Bolte had received it from his father.

Inside the watch on the back case was scratched "Jeffer" and below it "Son." The defendant offered expert testimony to the effect that it was unlikely that he did this. Without regard to the identity of the person who inscribed this name, the proof is abundant that this watch belonged to Mr. Bolte and that the defendant had it a few days after the crime.

The state also offered evidence to the effect that the defendant was at a gathering called, "The Night of Fun", in the neighborhood of the crime at about midnight on the occasion in question. This was sharply disputed by the evidence for the defendant.

The defendant did not testify. Claraetta Marsh, his girl friend, testified that the defendant came to her house June 14, 1968; they watched television and went to bed at 1:00 or 2:00 A.M. and remained there until 8:00 or 9:00 A.M. without him leaving the bed. She said he was having problems with his wife and had spent the weekends with her (Mrs. Marsh) for about six months. By her testimony he was with her when the crime was committed and he could not have done it.

Mrs. Marsh had given the police a written statement to the effect that the defendant left her house some time after midnight and returned at 8:00 or 9:00 A.M. When confronted with her earlier statement, her explanation was that she had a divorce pending since 1965 and she was frightened when she told police the defendant left at midnight. She said all other statements she gave the police were true.

The defendant offered extensive evidence to show that Mrs. Bolte had had marital problems with her husband and she had lived for a time with one Richard Hartman. She admitted this relationship but the proof in the case showed that it had ended and she was living in harmony with her husband at the time of these events. Hartman testified as a witness for the defendant but nothing in his testimony or the numerous witnesses called by the defendant to show this previous marital problem of Mr. and Mrs. Bolte suggests that anyone other than the defendant killed Mr. Bolte.

The evidence abundantly sustains the verdict of guilt. The wife of the deceased positively identified the defendant as the man who assaulted her and killed her husband. The defendant was found with the fruits of the crime soon afterwards. He sold Mr. Bolte's watch to a companion at work. The jury was justified in believing that the coins found on him were taken from the victim. The evidence does not preponderate against the verdict. See *State v. Grace,* Tenn., 493 S.W.2d 474. The assignments on the weight of the evidence are overruled.

The defendant says that he was deprived of due process and equal protection of law by the court's refusal to permit him to read the testimony of Phyllis Jean Gabbard from the former trial or to secure her attendance under TCA 40–2429 et sequitur.

Miss Gabbard was a nurse at the hospital and would have apparently testified as to Mrs. Bolte's demeanor while recovering there and when questioned by investigators and that she said that all Negroes looked alike to her.

On application of the defendant the trial judge permitted the defendant to read the testimony of Mrs. Ollie Mai Surles from the previous trial but denied the former testimony of Miss Gabbard and two other absent witnesses. No question is made as to the latter two.

On January 2, 1971, the defendant requested that a subpoena be issued for Miss Gabbard and it was executed on January 8, 1971, by leaving it at her last known ad-

dress. When the trial began January 18, 1971, the defendant's witnesses were called, he knew that the subpoena had been left at Miss Gabbard's address and that she was not present then. He announced ready for trial.

In a colloquy between court and counsel on March 1, 1971, it appeared that the court had directed an officer to go to the Nashville General Hospital where defense counsel had reported Miss Gabbard was employed; that on February 22, 1971, the officer returned into open court and told the judge as well as defense counsel that the witness was no longer employed there but had returned to Louisiana.

In the March 1, 1971, colloquy, the defense attorney said that he had telephoned Miss Gabbard in Texas and she first said she would come to the trial but then refused. The state cited TCA 40–2432 saying that she could be made to come. On March 2, 1971, the defendant repeated that he had talked to Miss Gabbard by telephone; that she had indicated to his secretary she would come but she had called back and refused to come. Defense counsel then declined to invoke TCA 40–2429 et sequitur saying that the defendant was indigent and there was not enough time to utilize the act. The state responded that it was the defendant's duty to ascertain the addresses of his witnesses and to furnish accurate and current addresses so that subpoenas could be properly served. The defendant's position was that he had not been negligent because he had directed that the subpoena be issued January 2, 1971.

On March 3, 1971, the defendant filed a motion in writing asking that the transcript of Miss Gabbard's former testimony be introduced in evidence or that a continuance be granted until she could be returned pursuant to TCA 40–2429 et sequitur. In response to the motion the state pointed out that the defendant was responsible for locating his witnesses; that the case had been delayed seven times at the defendant's request and had already been in progress 45 days. The court denied the motion.

From this record the defendant did not make a diligent effort to ensure that Miss Gabbard was properly subpoenaed. She had been away from the state almost two months when the defendant gave authorities the wrong address for her subpoena. He could have learned that Miss Gabbard had left the state as early as November 1970 and this would have given him time to seek her presence by TCA 40–2429 et sequitur, but he did not do so. Counsel knew January 18, 1971, that the witness had not been personally served. Although the exact date he found she was out of the state does not appear, in any event he knew this February 22, 1971, and waited until March 2 or 3, 1971, before seeking to invoke the statute to secure her attendance. He had relied on her promise to return. From the record he made no attempt to ascertain Miss Gabbard's address before February 22, 1971, even though she had not appeared in court on the first day of the trial. When he did find her, he did not then attempt to invoke TCA 40–2429 et sequitur to require her attendance. His request for a continuance was not made until the trial had been in progress six weeks.

■ A party desiring the issuance of process to secure the attendance of a witness has the continuing duty to follow up and supervise the service of the subpoena. Attorneys should be exact in the names and addresses of their witnesses. Officers should be given every aid in the performance of their duty of serving the process issued for the witnesses. This duty requires that attorneys provide the officers with all material facts, including the prospective witness's address, to ensure proper and timely service. That diligence does not appear here.

■ The court did not err in denying the motion to admit into evidence Miss Gabbard's prior testimony or to grant a continuance to obtain her presence under the Uniform Law to Secure Attendance of Witnesses from Within or Without a State in

Criminal Proceedings. Further, her testimony would have been largely cumulative to that of Nathaniel Tomes, a patient care technician, who assisted the nurses including Miss Gabbard in taking care of Mrs. Bolte. He attended Mrs. Bolte the entire first week of her hospital stay.

The defendant says that the court erred in admitting into evidence coins and footprints taken in violation of his constitutional rights. The footprint was taken after the lineup identification. He contends the coins were fruit of an unlawful arrest because he was committing no offense at the time of his arrest and the officers had no warrant. He also says this evidence was tainted by a faulty *Miranda* warning.

Miss Kraft compared the defendant's physical appearance with the newspaper sketch approved by Mrs. Bolte and noticed the remarkable similarity before she notified the officers of the defendant and his name. The officers examined a photograph of him in their files. They had the detailed information given them by Mrs. Bolte and were entitled to consider that description. When they saw the defendant it was evident that he matched the sketch approved by Mrs. Bolte as a likeness of the defendant and it was also evident that he matched the description given the investigating officers by Mrs. Bolte.

When a felony has in fact been committed, an officer may arrest without a warrant when he has reasonable cause for believing the person arrested to have committed it. TCA 40-803(3).

Considering this statute, our Supreme Court, in *Jones v. State,* 161 Tenn. 370, 33 S.W.2d 59, said:

" 'The substance of these provisions is that an officer may lawfully proceed to arrest without a warrant any person when the officer has, with reasonable cause, been led to believe that the person has committed, is committing, or is about to commit a felony. It is essential to the protection of society that a wide discretion be vested in officers chosen to en-

force our laws against felonies. It is impossible to define "reasonable cause" in terms to fit all cases arising. Each case must stand on its own facts. A narrow construction would open the way for the escape of desperate criminals and the defeat of justice. One too liberal would lead to the harassment of the innocent. But the officer may not be required to wait for assurance, for evidence which would convict; when circumstances fairly point to a felony it is his duty to act, and act promptly.' "

To the same effect: *Greer v. State,* 1 Tenn.Cr.App. 407, 443 S.W.2d 681; *State v. Tolden,* 224 Tenn. 119, 451 S.W.2d 432; *Fox v. State,* 214 Tenn. 694, 383 S.W.2d 25; *White v. State,* 210 Tenn. 78, 356 S.W.2d 411; *Day v. State,* 4 Tenn.Cr.App. 529, 474 S.W.2d 162.

■ Reasonable cause has been identified to be such as would justify a reasonable man to believe that a particular person arrested was guilty of a felony. *Davis v. State,* 2 Tenn.Cr.App. 297, 453 S.W.2d 438; *Campbell v. State,* 1 Tenn.Cr.App. 586, 447 S.W.2d 877. In dealing with probable cause, one deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327.

■ In determining probable cause, all information in the officer's possession, fair inferences therefrom, and observations, including past experiences, are generally pertinent. *Greer v. State,* supra.

■ The officers here knew a felony had been committed. They knew that Jefferson wore a hearing aid and that he fit the detailed description given by one of the victims of the crimes. They had probable cause to arrest Jefferson without a warrant as they saw him leave the employment office. Although the officers asked Jefferson to come with them and they did not formal-

ly arrest him or at that time tell him the crimes under investigation, we think the detention there amounted to an arrest.

Since the arrest was lawful, the coins and footprint were admissible. Among other things, the state says that the defendant voluntarily took the contents out of his pockets and no search was involved. In view of the fact that the arrest was lawful, this is immaterial. We consider the coins as discovered by a search following a lawful arrest. The footprints were likewise admissible. See *West v. State*, 221 Tenn. 178, 425 S.W.2d 602.

The defendant argues that his *Miranda* rights were violated and this made the coins and footprints inadmissible. He contends he did not understand the warnings because of his hearing problem.

When the officers noticed that he was having difficulty in hearing the warnings read, they required him to read the *Miranda* cards aloud. He indicated he understood the warnings and said he did not want a lawyer because he had done nothing wrong. Although the officers did not specifically tell him that he was being investigated for murder, rape and assault, the questions to him indicated those crimes for which he was under investigation. The defendant's girl friend, Mrs. Marsh, had previously joked with him about the sketch with the hearing aid. It is clear that he understood the charges being investigated. He signed a waiver of his rights and there is no evidence of coercion. The evidence does not preponderate against the findings of the trial judge as to the admissibility of the statement. *Lloyd v. State*, 223 Tenn. 1, 440 S.W.2d 797.

The defendant urges that Mrs. Bolte's testimony of identification was the result of an unduly suggestive lineup. He also says he should have had an attorney at the lineup.

■ The defendant had no constitutional right to an attorney at the preindictment lineup. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411. The defendant

signed a waiver of any right to an attorney and at no time requested one. Although the officers undertook to get an attorney from the public defender's staff to attend and waited some time for him to arrive, it was not necessary under these circumstances for him to be there.

■ The defendant was one of five black men in similar dress at the lineup. His hearing aid was removed and there was nothing to indicate that he had a hearing problem. All men repeated the same words spoken to Mrs. Bolte at the scene of the crime. Mrs. Bolte immediately recognized the defendant when she saw him in the lineup. It is clear that the lineup was conducted in a fair manner and that it was not improperly suggestive. This assignment is overruled.

■ It further appears that Mrs. Bolte's in-court identification had an independent origin. See *Greer v. State*, supra.

■ The defendant says the trial court erred in refusing the defendant's motion for the exhumation and autopsy of deceased's body for the taking and comparison of his footprints. By this evidence the defendant sought to support his theory that the deceased was killed in a struggle with Mrs. Bolte or one of her former lovers.

The evidence is uncontradicted that the deceased was killed from a blow to the back of the neck that would cause instant paralysis and the body would be drained of blood in three minutes. His head was almost severed from the body. At least two witnesses, including a medical examiner, testified that his feet were clean with no blood on them.

There were smeared, bloody footprints on the floors of several rooms. The person who made these footprints wore something on his feet so that only the general size and shape of the foot could be compared. The deceased's feet were bare and clean. This further discredits the defendant's theory that the footprints were caused by the de-

ceased. Taking the deceased's footprints would not have settled a major issue in the case. In *Dennis v. State,* 198 Tenn. 325, 279 S.W.2d 512, the court held that the court, in its discretion, may order exhumation of a body when the necessity for same is sufficiently made to appear. There the defense was self-defense and the expert testimony differed as to whether or not the deceased was shot in the back. The exhumation there showed that the deceased had been shot in the back. An exhumation here would not determine the issue as it did in *Dennis.*

22 Am.Jur.2d, Dead Bodies, Sec. 19, says:

" . . . (I)n a prosecution for homicide, the exhumation of the victim's remains may be ordered on the application of the state or of the defendant where it appears to be absolutely essential to the administration of justice. Thus, where the question of the guilt or innocence of the accused cannot be determined except by exhumation and autopsy of the body of the deceased, the court may and should order the disinterment even against the will of his relatives, and even though there is no statute specifically authorizing such proceedings. However, whether exhumation will be allowed is a discretionary matter for the court."

The trial judge did not abuse his discretion in refusing to order the body exhumed.

■ The defendant also says the trial judge should have ordered the district attorney general to seek exhumation of the body under TCA 38–604. He says the body is in a foreign state. That statute authorizes a district attorney general to petition for exhumation and have an autopsy when he believes that a death has been feloniously caused and that the cause of death cannot be adequately and safely determined in the absence of an autopsy. Here there was no question that the death was feloniously caused by the axe blow and that was determined at the scene of the crime June 15,

1968. The court did not err in denying this application.

■ We have examined the court's instructions and do not find that it unfairly commented on the evidence. The instructions as given fully, accurately and adequately covered the defendant's special request and it was not error to refuse it. See *Bostick v. State,* 210 Tenn. 620, 360 S.W.2d 472.

In accordance with *Pruett v. State,* Tenn., 501 S.W.2d 807 (1973), we remand this case for the hearing on the plea in abatement as outlined here and on the procedure used to select prospective jurors. In *Pruett v. State* our Supreme Court said:

"We have construed Section 27–329, T.C.A., to provide that the appellate court may properly remand for the taking of evidence of new facts never before presented in the case. *State ex rel. Guy v. Foster,* 160 Tenn. 285, 24 S.W.2d 897 (1938). If the facts in the record from the court below are so inadequate that justice cannot be served without the taking of further evidence, the court will remand for that purpose. *Carver v. Crocker,* 43 Tenn.App. 636, 311 S.W.2d 316 (1957). As the court said in *Stokely v. Southern Railway Co.,* 57 Tenn.App. 271, 418 S.W.2d 255 (1967):

" 'Where it appears from the record . . . that more satisfactory evidence can be obtained on the issues presented, and, if produced, will enable the court to come to a more satisfactory conclusion, the cause may be remanded for such additional proof.' "

All other grounds have been fully considered and are found to be meritless.

If on the hearing the trial judge finds that the proof supports the contention of the defendant on the plea in abatement, he may quash the indictment. If he finds the proof sustains the defendant's contentions on the procedure used to select prospective

jurors, he may grant a new trial. If the defendant disagrees with the findings of the trial judge, he may appeal on the issues involved in the remand.

It is so ordered.

RUSSELL and O'BRIEN, JJ., concur.

## OPINION ON PETITION FOR REHEARING

PER CURIAM.

A petition to rehear has been filed in this cause by the defendant, James Thomas Jefferson. The petition does not set forth any new matters not considered by the Court of Criminal Appeals on appeal and by this Court on defendant's petition for certiorari.

In denying defendant's petition for certiorari this Court was aware of the incorrect statement "Jefferson was first tried for the rape of Mrs. Bolte," when as a matter of fact each of the two trials was for the murder of Mr. Bolte. This incorrect statement in the opinion of the Court of Criminal Appeals was immaterial to the questions raised on appeal, and from an examination of the record resulted from the fact that in a written motion, counsel for the defendant so referred to it. The opinion of the Court of Criminal Appeals correctly reviews the evidence, and the law applicable to the assignments of error on the appeal.

The petition to rehear is denied.