Minnie Dennis *v.* State of Tennessee.

(*Nashville,* December Term, 1954.)

Opinion filed March 11, 1955.

Petition to Rehear denied June 10, 1955.

W. R. FAIN, JR., of Clarksville, for plaintiff.

NAT TIPTON, Assistant Attorney General, for the State.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

Minnie Dennis was convicted for the homicide of her husband for murder in the second degree with a punishment fixed at 15 years in the State prison.

On appeal the principal questions raised by her assignments of error are: (1) That the evidence preponderates against the judgment, and (2) that the Trial Court erred in admitting evidence of a subsequent autopsy on the body of the deceased.

Briefly stated, the theory of the State is that Minnie Dennis drove out to a tobacco field about 2:00 o'colck in the afternoon where her husband was working with three other men, and that after some discussion or argument

between them which was not heard by any of the witnesses in fairly close proximity she shot him while he was walking or running away from her. The theory of the defendant is that her husband became angered at her because a short time previously she had refused to endorse a note for him and that particularly the night before the killing her husband had cursed, threatened and generally abused her, and that she had gone out to the field in the afternoon the next day to take him a jar of ice water which he had forgotten to take with him after he had returned to town for lunch; that he was still angry with her and when she arrived at the field with the jar of water in order to ameliorate his feelings that he knocked her down and was kicking her when she, in self-defense, pulled a pistol from her bosom and shot him in order to protect herself from great bodily harm.

This couple had been married for several years and for the last two or three years the wife had been operating a taxicab and she testified that it was her habit, at the suggestion of her husband, that she carry a pistol with her which she said she customarily did in the bosom of her dress. The deceased was engaged in farming as well as other activities. He owned an automobile in addition to the taxicab which was operated by his wife.

On the day of the homicide the deceased was working in the tobacco field with three other men from rather early in the morning until about noon-time when two of them went in one direction to obtain lunch, while the deceased and another one of them went in the automobile of deceased back to town and ate lunch, not at home but at a public eating-place. Some time after they had returned to work and were working near one another the defendant drove up in her taxicab and the deceased left the vicinity of the other workers and went over to the taxicab where

he and his wife engaged in conversation which was just out of earshot of these other three men. The next thing any one of these three men who testified at the trial knew about it was when one of them yelled to the deceased to look out while he was walking away from his wife and back toward these three men. They say that at that instant she began firing her pistol, that he fell and that she then walked to her car and drove away. One of the witnesses testified that she was on the ground.

James Bagwell testified that the defendant was sitting in the car for a while and that when the deceased started back toward them, the other workers, the defendant got out of her car, walked around to the side of the car that the deceased was on, with a gun in her hand, and shot the deceased; that he fell and she fired altogether four times. That she then got back in her car and drove away without saying anything. That deceased fell face down and seemed to be dead when he got to him and that he saw a bullet wound right back of his ear. He did see some water and ice cubes on the ground.

Frank Smith testified that after the defendant drove up in her car and the deceased went over to it and they began talking, he could not hear them and did not pay any more attention until George Thomas Clardy yelled, ''Look out, Dan, look out;'' that when he looked up he saw George Thomas Clardy running ''opposite from me;'' that he himself started running and that he did not see the pistol fire but he heard the four shots; that he squatted down in the rows and he saw the deceased run and fall; that after the last shot he saw George get up and look around and he saw the defendant get up ''in about hands reach of Dan;'' that the defendant was ''laying'' on the ground; that the deceased was dead and lying face-down when he went

up there and that the deceased had been shot in the back of the head, that the defendant got in the car and left.

George Thomas Clardy testified that when the defendant drove up in her car and turned it around the deceased went to the car and talked to her a minute or two, then turned to come on back to the field where they were all working and that the defendant went around her car and when she came around it she had the gun in her hand, threw up the gun and he yelled, "Look out, Dan," about the time she started firing the gun; he says that the defendant was about 20 feet from the deceased when she started firing the pistol, that he had his back to her at the time he was shot, and that he saw the deceased stumbling and falling.

None of these witnesses, who were the only eyewitnesses, saw any weapon in the hand of the deceased and none of them saw the deceased strike or kick the defendant, although some of them saw where the water had been poured on the ground.

The defendant testified, on the other hand, that her husband knocked her down on the ground and was kicking her when she pulled the pistol from her bosom and fired upward striking him while he was standing somewhat over her and facing her.

Two physicians who examined the body testified. One of them said that the bullet entered his head back of and above the left ear. The other physician testified that there was a wound over the left eye, that he probed at that point and that the bullet entered at that point in the front of his head rather than in the rear.

On account of this conflict in the testimony of the two doctors the Trial Judge ordered that the body be exhumed and that an autopsy be made, although there was no order entered on the minutes of the Court to that effect.

This order was carried out over night by the undertaker who had buried the deceased and by several doctors of admitted ability and it was definitely determined that the fatal shot entered from back behind the left ear, that the bullet remained inside the skull and that the skull was not broken in front where the gash appeared over the left eyebrow.

Under the fourth and fifth assignments of error it is insisted that the Court was in error in overruling his objections to the introduction of the testimony of the undertaker and the doctors as to their findings upon such autopsy based in part upon the result of X-ray pictures; that the Court erred in not granting the defendant's motion for mistrial and it is further insisted that the action of the Judge in writing notes to the undertaker and the doctor directing the exhumation of the body and the autopsy without same being spread on the minutes and without any notice to the defendant and her counsel, as the same was a failure to comply with Code Sec. 9966.1, which is Chapter 61, Section 1, of the Acts of 1949, embodied in the 1950 Code Supplement. This Act provides the manner in which the District Attorney General may petition the Court for an order for an autopsy and exhumation of the body when the cause of death cannot be adequately determined otherwise.

In 20 Am. Jur., p. 352, Sec. 393, under the head of "Illegally Obtained Evidence," it is said:

"In criminal prosecutions, in particular, evidence is frequently obtained by methods that are morally reprehensible and defensive to fair dealing, under circumstances which meet with disapprobation of the Courts, and, in many instances, by means that are illegal. If, however, evidence offered in support of a fact in issue is relevant and otherwise competent,

it is generally admissible, although it may have been obtained unethically, wrongfully, or unlawfully or illegally, as where it was secured by trespass, unless its admission will violate a constitutional guaranty of the person against whom its admission is sought or is in contravention of a statutory enactment. * * *"

In 15 Am. Jur., p. 841, Section 19, it is said:

"Disinterment for Evidential Purposes:—The right of relatives of a deceased person to have his corpse remain undisturbed after burial must yield to the public interests, and in a prosecution for homicide, the exhumation of the victim's remains may be ordered on the application of the state or of the defendant when it appears to be absolutely essential to the administration of justice. Thus, where the question of the guilt or innocence of the accused cannot be determined except by exhumation and autopsy of the body of the deceased, the court may and should order the disinterment even against the will of his relatives. It seems, however, that the consent of relatives or next of kin has been required in some cases.

"The rule has been recognized that where the interests of justice demand it and where there is no other way to prove a fact except by the exhumation of a body which has been interred, the court may make an order for the disinterment of the body and an examination thereof, even in civil cases. In some jurisdictions it has been held that statutes empowering a court to compel a party to make discovery of evidence in his possession have no application to dead bodies as evidence."

Under Note 19 is cited the case of *Gray* v. *State,* 55 Tex. Cr. R. 90, 114 S. W. 635, 22 L. R. A., N. S., 513, in which a

Court ordered exhumation on the issue of self-defense where the State claimed deceased was shot in the back.

 It is clear from these authorities and others, that in the absence of a statute the Court has always had the discretion and power to order an exhumation and autopsy where the necessity for same sufficiently is made to appear. It would, therefore, seem that if the Code section above referred to purported by its terms in any manner to limit the authority of the judge or to vest in the Attorney General alone, exclusive authority to make the application, and otherwise attempted to cover the entire subject matter, then a failure to abide by the terms of the statute might raise a serious question of the admissibility of evidence obtained in violation of such statute. However, we do not think the statute does any of these things. On the contrary, by implication, it re-affirms the long-existing power and discretion of the Judge to grant or deny a request for such an order; it contains no provision whereby an accused person may make application to the Judge for such an order; and it is conceivable that a District Attorney General might not cooperate with an accused who desired such an order by refusing to file such a petition for the benefit of the accused; the obvious purpose seems to be to facilitate the Attorney General in the performance of his duty, when he deems such an order to be necessary, by providing expressly that he may file such petition and if same be granted, the costs shall be paid by the county, except that where a person is indicted, tried and found guilty of such alleged crime as may be revealed by such autopsy, the costs and expenses of the autopsy are made a part of the Court costs assessed against the accused.

Therefore, we hold that irrespective of whatever criticism otherwise may or may not be made of the manner in

which these proceedings were conducted in that regard, there was certainly no violation of the above-mentioned statute.

The action taken by the Judge was upon his own initiative and volition, which we think was entirely proper. Although he should have entered an order on the minutes of the Court as the Court speaks only through its minutes, this was, no doubt, due to an oversight and amounts to no more than an irregularity because the Judge was obviously acting as a judicial official and not as a private person and acting in the interests of proper administration of justice because of the conflict in the testimony of these two doctors. Moreover, there is no probability that if the defendant or her counsel had had notice, the result would have been any different in the findings from the autopsy, so that prejudice to the defendant does not appear.

We are, therefore, of opinion that this evidence was not rendered inadmissible by reason of these irregularities.

Suffice it to say, therefore, that in overruling the assignments four and five we must necessarily overrule the first assignment to the effect that the evidence preponderates against the verdict of the jury.

The second assignment is that the Court required the defendant to place the gun exhibited by the State in her bosom or brassiere to illustrate how she carried the pistol, over the objection of defendant. Counsel cites *Stokes* v. *State,* 64 Tenn. 619, wherein it was held to be reversible error to require the defendant to place his own bare foot in a track discovered at the scene of the crime and preserved for evidence by scooping up the clay where the track had been found. This case is easily distinguishable from the present situation in that that case was re-

versed because the defendant was thereby required to give evidence against himself in violation of his constitutional right, whereas in this case the defendant herself, had testified that she carried this gun in her bosom. Obviously, the Attorney General had a right to test her credibility by asking her to demonstrate how the same was carried. There was certainly no error so far as the Court permitting such demonstration is concerned.

The third assignment relates to an objection to the cross-examination of the Attorney General and ruling of the Judge thereon. We find no merit in same.

All assignments of error are, accordingly, overruled and the judgment of the lower Court is affirmed.