## In re THE EXHUMATION OF MERIWETHER LEWIS.

### No. 1–97–0163.

United States District Court, M.D. Tennessee, Columbia Division.

March 24, 1998.

*MEMORANDUM*

HIGGINS, District Judge.

The Court has before it the motion (filed December 31, 1997; Docket Entry No. 7) of the State of Tennessee to remand this action to the Circuit Court of Lewis County, Tennessee, its memorandum (Docket Entry No. 8) in support, and the response (filed January 9, 1998; Docket Entry No. 12) of the United States of America. Also before the Court is the motion (filed January 9, 1998; Docket Entry No. 11) of the United States for leave to amend the notice of removal, and the response (filed January 29, 1998; Docket Entry No. 16) of the State of Tennessee. The Court also has before it the motion (filed December 12, 1997; Docket Entry No. 3) of the United States to dismiss the State of Tennessee's petition for exhumation, its memorandum (Docket Entry No. 4) in support, the response (filed December 31, 1997; Docket Entry No. 6) of the State of Tennessee, and its memorandum (Docket Entry No. 9) in support.

For the reasons discussed below, the State's motion to remand will be denied and the United States' motion to amend the notice of removal will be denied as moot. In addition, the United States' motion to dismiss the State's petition to exhume will be granted.

**I.**

In the early years of the nineteenth century, Meriwether Lewis and William Clark touched off this nation's quest for its manifest destiny with their exploration of the newly acquired Louisiana Territory, the uncharted land between the Mississippi River and the Pacific Ocean.[1] In 1807, a few months after the conclusion of this highly successful expedition, Captain Lewis[2] was appointed Governor of the Upper Louisiana Territory and settled in St. Louis, Missouri.

Joseph D. Baugh, Jr., Office of the District Attorney General, Franklin, TN, for Exhumation of Meriwether Lewis.

Michael L. Roden, Office of the United States Attorney, Nashville, TN, for United States of America.

1. For a more detailed history, *see* the State's memorandum (Docket Entry No. 9), attachment 5. *See also,* Stephen E. Ambrose, *Undaunted Courage: Meriwether Lewis. Thomas Jefferson, and the Opening of the American West* (1996).

2. Meriwether Lewis was promoted to the rank of Captain in the United States Army on December 5, 1800.

In September of 1809, Captain Lewis embarked on a trip to Washington, D.C., to learn why the War Department had refused to honor certain drafts written by him for such things as translating the laws of the territory into French and buying gifts for Native Americans who had provided assistance during the expedition.[3,4] On October 10, 1809, Captain Lewis arrived at a frontier outpost near the Natchez Trace known as Grinder's Stand.[5] On the morning of October 11, 1809, Captain Lewis died at the age of thirty-five. He was later buried near Grinder's Stand.

Although it is generally believed that Captain Lewis died as the result of gunshot wounds to the head and chest,[6] historians disagree as to whether the wounds were inflicted by Captain Lewis' own hand or the hand of another. Historian Stephen E. Ambrose, a proponent of the suicide theory, notes that Captain Lewis had been drinking heavily, taking opium to treat malaria, battling depression, and facing financial ruin. Mr. Ambrose further notes that "the two men who knew Lewis best and loved him most,"[7] Thomas Jefferson and William Clark, believed that Captain Lewis committed suicide.

Evidence also exists, however, that Captain Lewis was murdered. Proponents of the murder theory mainly rely on a report written in 1848 by the committee appointed to construct a monument on Captain Lewis' gravesite. In order to verify that the monument was placed above the correct grave, the committee opened the grave and examined the upper portion of the skeleton. The committee later reported as follows:

> The impression has long prevailed that under the influence of disease of body and

mind—of hopes based upon long and valuable services—not merely deferred, but wholly disappointed—Governor Lewis perished by his own hands. It seems to be more probable that he died by the hands of an assassin.

4 Robert H. White, *Messages of the Governors of Tennessee: 1845–1857*, 386 (Tennessee Historical Commission 1957) (1848).

In 1925, following the conveyance of 50 acres surrounding the gravesite to the United States, President Calvin Coolidge proclaimed that the land would thereafter be known as the Meriwether Lewis National Monument. On April 6, 1927, Tennessee Governor Austin Peay signed a bill ceding an additional 150 acres of adjoining land to the United States. A few weeks later, Governor Peay signed a bill ceding jurisdiction over all 200 acres to the United States. This bill provided that "this cession is upon the condition that the State of Tennessee shall retain a concurrent jurisdiction only so far as that all civil and criminal processes issued under the authority of the State of Tennessee may be executed on said land." United States' memorandum (Docket Entry No. 4), attachment 5 at 3.

The Meriwether Lewis National Monument is currently maintained by the Natchez Trace Parkway for the National Park Service, a division of the United States Department of the Interior. In April of 1997, the Governor of Tennessee and the Director of the National Park Service signed a "Memorandum of Agreement for Concurrent Jurisdiction at National Park Service Units within the State of Tennessee." In the Agreement, the State ceded concurrent criminal law enforcement jurisdiction over certain National Park Service land, including all land encom-

---

3. When the government refused to honor the drafts, Captain Lewis became personally liable to the draft payees. As a result, Captain Lewis' personal debt amounted to approximately $4,000.00.

4. Although Captain Lewis originally planned to travel by water, he changed his mind in Memphis and decided to proceed the rest of the way on land. In light of escalating tensions between the United States and Great Britain, Captain Lewis decided not to risk capture by the British on the water route from New Orleans to the capitol.

5. At that time, the Natchez Trace was a trade route running from Tupelo, Mississippi, to Nashville, Tennessee. Grinder's Stand was located about seventy miles south of Nashville.

6. Some historical accounts suggest that Captain Lewis also incurred wounds from cutting himself with his razor.

7. Ambrose, *supra*, at 467.

passed by the Natchez Trace Parkway, to the United States. In return, the United States retroceded to the State "concurrent criminal law enforcement Jurisdiction currently subject to exclusive jurisdiction of the United States." State's memorandum (Docket Entry No. 9), attachment 3.

## II.

In light of the unresolved controversy surrounding the death of Captain Lewis, James E. Starrs, a professor of law and forensic science at George Washington University, met with the Natchez Trace Parkway Superintendent in 1992 to discuss a proposal to exhume Captain Lewis' body. Subsequent correspondence reflects that Professor Starrs was instructed to apply for a permit issued by the National Park Service in accordance with the Archaeological Resources Protection Act, 16 U.S.C. §§ 470aa–470mm.[8]

Instead of complying with ARPA, Professor Starrs and Joseph D. Baugh, District Attorney General for the 21st District of the State of Tennessee, initiated a coroner's inquest upon the body of Captain Lewis, a process described in Tennessee Code Anno-

tated, Sections 38–5–101 to 38–5–121. The inquest was convened in Lewis County, Tennessee, in June of 1996.[9] The jury members unanimously recommended that "[b]ecause of the importance of the person in question to the history of Lewis County, we feel exhumation is necessary for closure." State's memorandum (Docket Entry No. 9), attachment 2.

A week after the coroner's inquest, Professor Starrs wrote the Natchez Trace Parkway Superintendent and explained that "[n]ow that the Coroner's Jury has rendered its verdict, I should like to renew my efforts ... to obtain the consent of the National Park Service to exhume the remains of Meriwether Lewis." United States' memorandum (Docket Entry No. 4), attachment 16. In a letter dated July 9, 1996, the Superintendent denied Professor Starrs' request.

Apparently still unwilling to seek a permit under ARPA, the State of Tennessee, through Mr. Baugh, filed a petition on December 16, 1996, in the Circuit Court of Lewis County to exhume and autopsy the body of Meriwether Lewis pursuant to Tennessee Code Annotated, Section 38–1–104.[10]

---

**8.** ARPA seeks to protect archaeological resources from loss and destruction due to uncontrolled excavations and pillage. 16 U.S.C. § 470aa(a)(3). An "archaeological resource" is defined as any material remains of past human life or activities which are of archaeological interest and are at least 100 years of age. 16 U.S.C. § 470bb(1). Any person seeking to excavate any archaeological resource located on federal land must first apply with the federal land manager having authority over the land in question. 16 U.S.C. § 470cc(a). In the case of archaeological resources located on the Natchez Trace Parkway, the federal land manager is the National Park Service. An applicant who completes the ARPA process but who is denied a permit may then file for review under the Administrative Procedure Act, 5 U.S.C. §§ 701–06.

**9.** As described by the Manager of the Lewis and Clark National Historic Trail, who attended the inquest:

The inquest was called by the county coroner under an obscure Tennessee law that provides for such an inquest in cases when the coroner cannot make an independent determination regarding suicide or homicide in a violent death. According to published reports, the law has not been used in this century....

The coroner's jury ... consisted of seven residents of Lewis County, and one alternate. The jury heard testimony from 13 witnesses during

the 2–day hearing. The testimony of the witnesses was coordinated by the District Attorneys and Professor James Starrs. Professor Starrs ... has performed forensic analysis on other historic "celebrities" such as Jesse James and Millard Fillmore....

There were approximately 100 to 150 spectators at the hearing, three or more Nashville television station reporters, a CNN crew, print reporters from several areas in Tennessee, as well as the Associated Press, Washington Post, Boston Globe, and possibly other news organizations.

United States' memorandum (Docket Entry No. 4), attachment 15. Historian Stephen Ambrose was apparently invited to testify at this inquest, but declined to do so.

**10.** Section 38–1–104 provides in pertinent part as follows:

Whenever the district attorney general of any judicial district in this state is of the opinion that any death occurring in any county in that district attorney general's judicial district has proceeded from a felonious cause, and that the cause of death cannot be adequately and safely determined in the absence of an autopsy upon the body of the deceased, the district attorney general may file with the judge of the court having criminal jurisdiction the district attorney general's sworn petition, which shall set

In the petition, the State asserts that Captain Lewis' death "proceeded from a felonious cause" and that the cause of death "cannot be adequately determined in the absence of an exhumation and an autopsy." Notice of removal (filed December 9, 1997; Docket Entry No. 1), attachment.[11]

On January 17, 1997, counsel for the Department of the Interior and Michael L. Roden, an Assistant United States Attorney, met with Mr. Baugh and Professor Starrs to discuss the State's petition and the United States' interest in the matter. After much discussion, the parties agreed that Professor Starrs would apply to the National Park Service for a permit to exhume the body of Captain Lewis pursuant to ARPA.

In June of 1997, Professor Starrs filed an ARPA application with the National Park Service.[12] By letter dated September 24, 1997, the Regional Director of the Southeast Region of the National Park Service denied the permit. An appeal with the National Director, the final agency decision-maker, is currently pending.

### III.

After meeting with Mr. Baugh and Professor Starrs on January 17, 1997, the United States government believed the State's petition to exhume would be held in abeyance pending the outcome of the ARPA proceeding.[13] After a number of continuances, the petition was set for a hearing in the Circuit Court of Lewis County on December 12, 1997. After learning that the State planned to proceed with the hearing despite the pending ARPA process, the United States filed a notice of removal pursuant to 28 U.S.C. § 1441(a) on December 9, 1997.

The State now moves to remand the case on the grounds that the petition is not a civil action subject to removal under Section 1441(a) and that the notice of removal was not timely filed. Although the United States responds that removal under Section 1441(a) is proper and timely, it also moves for leave to amend the notice of removal to include 28 U.S.C. § 1442(a) as an alternate basis for removal.

### A. A "Civil Action" Subject to Removal Pursuant to Section 1441(a)

Section 1441(a) provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." Federal law determines whether a state court action is a "civil action" within the meaning of the federal removal statute. *Georgia v. Fleck & Assocs., Inc.*, 622 F.Supp. 256, 258 (N.D.Ga.1985); *Quinn v. Book Named "Sixty Erotic Drawings From Juliette"*, 316 F.Supp. 289, 292 (D.Mass.1970). Furthermore, "[t]he nature of the right asserted, rather than the form of the proceeding, determines whether an action is of a civil or criminal nature." *Fleck & Assocs.*, 622 F.Supp. at 258.

In determining whether an action is civil or criminal for purposes of removal, courts construe "civil action" fairly broadly.[14] In addition, most courts define "civil action" in the negative; i.e., a civil action is anything that is not a criminal action. One court explained

---

forth the district attorney general's belief that the death in question proceeded from a felonious cause, that the cause of death cannot be adequately determined in the absence of an autopsy and the reasons which actuate the district attorney general's belief as to the felonious nature of such death.

**11.** The State acknowledges that, should its petition be granted, Professors Starrs will perform the exhumation.

**12.** The application was submitted by both Professor Starrs and William M. Bass, III, Professor Emeritus and Director of the Forensic Anthro-

pology Center, University of Tennessee, Knoxville, Tennessee.

**13.** *See* section III.B. for further discussion of this issue.

**14.** *See* 14A Charles Alan Wright et al., *Federal Practice and Procedure* § 3721 at 200–01 (1985) ("The limitation to civil actions is not particularly important, however, since the term 'civil action' has been construed broadly.... In effect, therefore, the limitation to civil actions in Section 1441 may mean no more than that criminal, and perhaps penalty, actions are not removable except as otherwise provided by statute.").

that "[c]ivil actions are those which do not involve criminal prosecution or punishment and are of a character traditionally recognized by courts of common law or equity." *Balf Co. v. Exxon Corp.*, 682 F.Supp. 735, 736 (D.Conn.1988).

When the Attorney General of Massachusetts sought to have a book declared obscene pursuant to a state statute, the publisher filed notice of removal pursuant to Section 1441(a). *Quinn*, 316 F.Supp. at 291. After analyzing the "essential nature" of the proceeding, the court concluded that the state statute served only to aid in the enforcement of the state's criminal laws. *Id.* at 292. As the proceeding was thus ancillary to a criminal prosecution, it was not a "civil action" subject to removal. *Id.*

Similarly, when a night club filed notice to remove a nuisance action brought against it by the State of Georgia,[15] the State argued the action was criminal in nature and thus not removable under Section 1441(a). *Fleck & Assocs.*, 622 F.Supp. at 257. The court agreed and offered the following reasons in support: (1) the action sought to vindicate public policies against sodomy, lewdness, and threats to public health; (2) the action was somewhat penal in nature; (3) the prohibitory nature of the action aided in the enforcement of Georgia's criminal laws; and (4) if a monetary penalty were imposed, the money would become public funds. *Id.* at 258–59. The court held the action was quasi-criminal and therefore not subject to removal pursuant to Section 1441(a).

**15.** According to the State, the night club was a meeting place for homosexual men.

**16.** A petition under this section may also include a request for exhumation, if necessary. *See Dennis v. Tennessee*, 198 Tenn. 325, 279 S.W.2d 512, 515 (1955).

**17.** The Court rejects the State's concern that this action might set a precedent such that if a murder victim is carried onto National Park Service land in Tennessee and buried there in an attempt to conceal the homicide, a Tennessee law enforcement official would be thwarted if he or she sought to exhume the body. At its core, this action involves the exhumation of an important historical figure buried 189 years ago on what is now federal land; any precedent set will have little effect on law enforcement in Tennessee.

In this action, the State filed a petition pursuant to Tennessee Code Annotated, Section 38–1–104, which provides that a district attorney who believes that a death in his or her district has proceeded from a felonious cause, and that the cause of death cannot be adequately and safely determined in the absence of an autopsy upon the body of the deceased, may apply with the judge of the court having criminal jurisdiction for permission to conduct an autopsy.[16] The State claims this action is criminal in nature, and thus not subject to removal, because a district attorney such as Mr. Baugh has the authority to petition the state court for an exhumation given his belief that the death of Captain Lewis proceeded from a felonious cause.

Although Section 38–1–104 is criminal in form, the Court concludes that the exhumation sought in this particular case is not a criminal action. Unlike *Quinn* and *Fleck & Assocs.*, this action will not aid in enforcing Tennessee's criminal laws, will not provide evidence to be used to apprehend or convict the alleged assassin, and will not serve a prohibitory or penal purpose.[17] In fact, Mr. Baugh conceded during the case management conference that the State does not seek to ascertain the alleged murderer of Captain Lewis.[18] In light of the above, the State cannot reasonably sustain its contention that exhumation would serve a legitimate law enforcement purpose.

Unlike a criminal proceeding, the exhumation of the body of Captain Lewis would serve purely academic and historical goals.[19]

**18.** Mr. Baugh has asserted only that his "overriding interest ... was to close a 'cold case' concerning the questionable nature and circumstances of the death of an individual within the precincts of his jurisdiction." State's memorandum (Docket Entry No. 8) at 3.

**19.** In the only similar case found by the Court, several plaintiffs sought to exhume the body believed to be Lee Harvey Oswald. *Eddowes v. Curry*, 599 S.W.2d 367, 368 (Tex.Civ.App.1980). According to the plaintiffs, Mr. Oswald had been kidnapped by the Soviet Union prior to the assassination of President John F. Kennedy and a KGB agent had assumed his identity. The plaintiffs claimed exhumation would establish whether the body was the KGB agent or Mr. Oswald. The Texas Court of Civil Appeals dismissed the case, finding the plaintiffs lacked standing. *Id.*

Despite the criminal cloak of Section 38–1–104, the State seeks to exhume ancient remains buried on federal property, conduct which falls squarely and solely under ARPA.

The Court recognizes the tenacity of the individuals seeking to exhume the body of Captain Lewis. The exhumation has been debated in a number of forums: the pending ARPA application filed by Professor Starrs, the Lewis County coroner's inquest, and now the petition filed by the State pursuant to Section 38–1–104. Despite these varied and often creative attempts to find many heads on which to hang the hat of exhumation, the State cannot escape the fact that ARPA is the *only* remedy by which permission to exhume the body of Captain Lewis may be obtained; it cannot be obtained through this pseudo-criminal action pursuant to Section 38–1–104, with the State acting as a stalking horse for Professor Starrs.

The Court concludes that this action resembles a civil proceeding more than it resembles a criminal proceeding. *See Fleck & Assocs.*, 622 F.Supp. at 258. Accordingly, the Court rejects the State's argument that removal pursuant to Section 1441(a) is inappropriate due to the alleged criminal nature of the action.

B. *Timeliness of the Notice of Removal*

Under 28 U.S.C. § 1446(b), notice of removal must be filed within thirty days after the defendant receives a copy of the initial pleading. This thirty-day time limit is not jurisdictional, but rather is subject to waiver or estoppel. *Grubbs v. General Elec. Credit Corp.*, 405 U.S. 699, 703–04, 92 S.Ct. 1344, 1347–48, 31 L.Ed.2d 612, 618 (1972); *Somlyo v. J. Lu–Rob Enters.*, 932 F.2d 1043, 1046 (2d Cir.1991).

Although the National Park Service received a copy of the State's petition for exhumation on December 19, 1996, the United States did not file notice of removal until December 9, 1997. According to the United States, Mr. Baugh and Mr. Roden discussed removal at their meeting on January 17, 1997, but the issue was not pursued after the

parties agreed that Professor Starrs would apply for an ARPA permit. "It was the clear understanding of the government that all were in agreement that as long as the petition was not actively pursued, the government would not remove it." United States' response (Docket Entry No. 12) at 11.

Although Mr. Baugh now claims removal was not discussed at this meeting, he wrote to Mr. Roden on December 1, 1997, that "[i]f you seek to remove this case to federal court, I need to know as soon as possible." *Id.*, attachment A. In light of this letter and Mr. Baugh's awareness that removal was still a possibility, the Court finds he is estopped from objecting to the timeliness of the removal. *See Loftin v. Rush*, 767 F.2d 800, 805 (11th Cir.1985) ("While we emphatically disapprove of the government's tardiness, we will not order this cause remanded on technical grounds.").

The Court concludes that: (1) the State's petition to exhume the remains of Captain Lewis is a civil action subject to removal under Section 1441(a) and (2) the State is estopped from arguing that notice of removal was not timely filed. As removal under Section 1441(a) was proper, the Court will not consider whether removal would also be appropriate under Section 1442(a). Accordingly, the State's motion to remand will be denied and the United States' motion for leave to amend will be denied as moot.

IV.

After filing a notice of removal, the United States moved for dismissal of the State's petition for exhumation pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. As the State's petition does not comply with the provisions of ARPA, the Court will grant this motion.

The Court rejects the State's argument that it has concurrent jurisdiction over the remains of Captain Lewis under the retention of limited jurisdiction by Governor Peay in 1927 or under the 1997 Memorandum of Agreement between the State and the Na-

---

at 370. While *Eddowes* does not involve ARPA or the federalism issues implicated in the action before this Court, it does support this Court's

conclusion that an exhumation sought for academic and historical purposes is a civil, not a criminal, proceeding.

 

tional Park Service. In 1927, Governor Peay ceded jurisdiction over the Meriwether Lewis National Monument to the United States, reserving only the right to execute "civil and criminal processes issued under the authority of the State of Tennessee." United States' memorandum (Docket Entry No. 4), attachment 5 at 3. In 1997, the State and the National Park Service agreed only to establish concurrent criminal law enforcement jurisdiction over the Natchez Trace Parkway. The State's request to exhume the body of Captain Lewis involves neither service of process nor the enforcement of criminal laws; instead, the request is clearly a civil action involving archaeological resources found on federal land. Accordingly, the State of Tennessee lacks jurisdiction over any request to exhume the body of Captain Lewis.

As explained previously, the relief sought by the State in this action is found solely through ARPA. The State can either (1) watch the progress of Professor Starrs' ARPA application; or (2) apply for an ARPA permit through a state official.[20] ARPA is simply the only remedy through which the State or anyone else can seek the exhumation of the body of Captain Lewis. As the current petition filed by the State does not comply with ARPA, no relief is available in this Court and the United States' motion to dismiss must be granted.

The bones of Captain Lewis will remain undisturbed, at least for the present.

An appropriate order will be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the motion (filed December 31, 1997; Docket Entry No. 7) of the State of Tennessee to remand this action to the Circuit Court of Lewis County is denied. The motion (filed January 9, 1998; Docket Entry No. 11) of the United States for leave to amend the notice of removal is denied as moot. The United States' motion (filed December 12, 1997; Docket Entry No. 3) to dismiss the petition is granted.

This action is dismissed without prejudice.

20. Under ARPA, any "person" may apply for a permit. "Person" is defined to include any offi-

Entry of this order shall constitute the judgment in this action.

It is so ORDERED.

cer, employee, agent, department, or instrumentality of any State. 16 U.S.C. § 470bb(6).