# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 28, 2005

## MARCUS E. THOMPSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Sullivan County**
**No. C48,784     Phyllis H. Miller, Judge**

---

**No. E2004-03028-CCA-R3-PC - Filed January 4, 2006**

---

The petitioner, Marcus E. Thompson, appeals the denial of his petition for post-conviction relief, arguing that the post-conviction court erred in finding he received effective assistance of trial and appellate counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

Larry R. Dillow, Kingsport, Tennessee, for the appellant, Marcus E. Thompson.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Robert H. Montgomery, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

**Procedural History**

On September 8, 1998, the Sullivan County Grand Jury issued a five-count presentment charging the petitioner with criminal conspiracy to sell or deliver more than 300 grams of cocaine (count one); possession of more than 300 grams of cocaine for resale (count two);[1] sale of over .5

---

[1] The full wording of count two of the presentment charged that the petitioner "did unlawfully, feloniously and knowingly possess three hundred (300) grams or more of a substance containing Cocaine, a Schedule II Controlled Substance, with the intent to sell or deliver the said controlled substance."

grams of cocaine (count three);[2] possession of drug paraphernalia (count four); and possession of over one-half ounce of marijuana for resale (count five). The facts of this matter, as laid out in the petitioner's direct appeal, are as follows:

Trial commenced on May 21, 2001. The State called Larry Robbins as its first witness. Robbins testified that in April 1998, he worked for the Johnson City Police Bureau and was assigned to work as an agent for the 1st Judicial District Drug Task Force (1st DTF). Robbins explained that "[t]he First District is made up of our (4) four counties, Washington, Carter, Unicoi and Johnson, and each department is encouraged to send an employee from their department to the Drug Task Force to work as one entity to work the drugs in that four county area." Robbins related that often the cases crossed the county lines into another jurisdiction and thereupon the 1st DTF would contact the drug task force from the other jurisdiction and the two forces would work together.

The 1st DTF arranged a controlled buy of one ounce of crack cocaine from Sanford Whetsel, also known as Turk Whetsel, on April 29, 1998. Upon his arrest and in exchange for a possible "recommendation from the D.A.," Whetsel agreed to arrange for his supplier, Melisa Long, to bring him more crack cocaine. At that time, Long resided in Kingsport, outside the jurisdiction of the 1st DTF. Accordingly, Whetsel arranged for Long to bring two ounces of crack cocaine to a McDonald's Restaurant in Gray, a locale in Washington County, which was within the jurisdiction of the 1st DTF. The agreed purchase price was $1,600 or $1,800 an ounce. Robbins further noted that "[s]omeone who's buying an ounce at a time is someone that's going to be reselling it."

Later on April 29, 1998, Long brought the crack cocaine to the prearranged location and she was arrested. Robbins talked with Long about cooperating with the 1st DTF to "help herself out and hopefully get a recommendation towards the D.A. about her involvement." Long revealed that her supplier, the [petitioner], was located in Sullivan County, within the jurisdiction of the 2nd Judicial District Drug Task Force (2nd DTF). Robbins contacted Brian Bishop, the Director of the 2nd DTF and asked for cooperation in apprehending Long's supplier. Director Bishop agreed to help.

Later that evening, Long, acting per her agreement with the 1st DTF, made a telephone call to a certain number to arrange a drug transaction with the [petitioner]. Robbins saw the number that Long dialed, but he was unable to overhear the conversation. Thereafter, agents with the 1st DTF drove Long to

---

[2]The full wording of count three of the presentment charged that the petitioner "did unlawfully, feloniously and knowingly sell or deliver point five (.5) grams or more of a substance containing Cocaine, a Schedule II Controlled Substance."

Sullivan County. Prior to the arranged buy, Long's person and possessions were searched and no contraband was found. The rest of the arranged buy was conducted through members of the 2nd DTF.

Robbins related that Long was charged with a crime in the Washington County Criminal Court and that those charges were still pending at the time of trial. Robbins opined that Long hoped her case would be dismissed in return for her cooperation with the authorities.

Melisa Long testified that she was arrested by Robbins on April 29, 1998, at a McDonald's Restaurant in Gray. Robbins asked Long to tell him where she obtained the crack cocaine. Long revealed that the [petitioner] was her supplier. After agreeing to help the 1st DTF apprehend the [petitioner], Long called the [petitioner] from a pay phone outside the McDonald's Restaurant. Long told the [petitioner] that "I needed more of what I had before," indicating that she needed two more ounces of crack cocaine. Long asserted that the price of the crack cocaine was over $1,000 an ounce, but that she already knew the price before she called. The [petitioner] directed Long to go to the house of his cousin, Jenice Thompson, to obtain the drugs. Specifically, Long testified that "[the [petitioner]] told me to go. I mean, he told me to go there. I been there before. And he told me to go."

Long further stated that within thirty days prior to April 29, 1998, she had been to Thompson's residence to obtain cocaine at the [petitioner's] direction. The [petitioner] objected to this testimony, but the objection was overruled. Long asserted that on the previous occasion, she went to Thompson's apartment in the Amber Court Apartments on Moreland Drive. Thompson's boyfriend, Daryl Williams, also known as Daryl Lathen, was also at the apartment. Long did not give Thompson or Williams any money; however, she obtained cocaine from one of them. Long could not specifically recall whether Thompson or Williams gave her the cocaine. Long did not have to ask for the cocaine because "[t]hey knew what I was coming for."

In the early morning hours of April 30, 1998, Director Bishop with the 2nd DTF drove Long to Thompson's apartment. While Director Bishop waited in the vehicle, Long went inside Thompson's apartment. Once again, both Thompson and Williams were in the apartment. "They" gave Long the crack cocaine. Long explained that she did not remember which person gave her the crack cocaine, but did recall that it was either Thompson or Williams. Long also stated that she did not have to tell Thompson or Williams why she was there. Long apologized for being late and placed the crack cocaine in her purse. She did not give Thompson or Williams any money at that time. Long then left the apartment and got into the car with Director Bishop to whom she relinquished possession of the crack cocaine.

Later in the afternoon of April 30, 1998, Long called the [petitioner] and arranged to meet him in the parking lot of a Revco drugstore on Stone Drive in order to pay him for the crack cocaine. Long was to pay the [petitioner] $3,600 which she obtained from DTF agents.

Soon after the telephone call, the [petitioner] arrived at the Revco parking lot. Long sat in the front passenger seat of the [petitioner's] vehicle. Long told the [petitioner] that she had the money and the [petitioner] instructed Long to put the money in the glove compartment of his vehicle. Long removed the money from her purse and placed $3,300 in the [petitioner's] glove compartment. Long explained that she kept $300 of the money because

> I guess it was my--for making like going down there and making a run or whatever, I guess that's what I was supposed to get paid out of it.
>
> . . . .
>
> I think we, maybe it was supposed to have been maybe a hundred an ounce or something like that, so it come up to be three ounces, so three hundred dollars ($300.00).

After Long placed the money in the glove compartment, she and the [petitioner] talked for a short time. Shortly thereafter, they were approached by the authorities and were arrested.

Long testified that she had known the [petitioner] for approximately ten years and they had attended high school together. Long admitted that she had been the [petitioner's] girlfriend in high school, but after Long became pregnant, the [petitioner] ended the relationship. Approximately ten years after the end of their relationship, Long encountered the [petitioner] in a club and renewed their acquaintance. Soon thereafter, Long contacted the [petitioner] about purchasing crack cocaine for her sister who was an addict. She explained that "I'm not ready to go out in the street and buy no drugs." Long asserted that she did not use drugs at the time of the offenses.

Long testified that she had never been charged with a crime in Sullivan County but still had charges in Washington County which had been pending for approximately three years. Nevertheless, Long hoped to have the charges dismissed. Long admitted that she never took drugs directly from the [petitioner's] hands, "but he would tell me where to get it."

-4-

Regarding the ounce of crack cocaine she sold to Whetsel, Long related that initially she did not have to pay for those drugs. Instead, the drugs were "fronted" to Long because she already had a buyer for the crack cocaine. After receiving the money from the buyer, Long was to return with the money and pay for the cocaine. Long explained that even though she had obtained crack cocaine from Thompson and Williams on previous occasions, "they're not going to front anything to me if he [the [petitioner] didn't tell them to."

Long stated that in the thirty days prior to April 29, 1998, she had obtained drugs through the [petitioner] on three occasions. She opined that "the first one, I probably was at the bridge. The second two maybe had been at the house [of Thompson]. That was three years ago. I don't really remember that far back." Long related that the bridge was at "John B. Dennis and Moreland Drive." She stated that Thompson's apartment was also on Moreland Drive. Furthermore, Long testified that prior to obtaining drugs from underneath the bridge, she spoke with the [petitioner]. The [petitioner] instructed Long to go to that particular location to obtain the crack cocaine.

Brian Bishop, the director of the 2nd DTF, testified that at approximately midnight on April 29, 1998, he was contacted by the 1st DTF and was advised "that a pick up of cocaine had been arranged." Subsequently, agents with the 1st DTF brought Long to Sullivan County to meet with Director Bishop. Director Bishop searched Long's person and belongings prior [to] their departure for Thompson's apartment. Long had no contraband or money on her person or in her purse. Director Bishop then drove Long to Thompson's apartment on Moreland Drive at approximately 1:00 a.m. on April 30, 1998. Director Bishop waited in the vehicle while Long went into the apartment. Long returned to the vehicle with what appeared to be two ounces of crack cocaine. Director Bishop testified that such an amount of crack cocaine was far too large for personal use.

Director Bishop next had contact with Long on the afternoon of April 30, 1998. Long had arranged to meet the [petitioner] in the Revco parking lot to pay for the drugs. Long was wired with a body transmitter and the agents monitored the transaction with a receiver. Long was given $3,600 prior to meeting with the [petitioner] to pay for the crack cocaine. When the agents heard a pre-arranged signal, they moved in and took the [petitioner] into custody. During a search of the vehicle, the agents discovered the money in the glove compartment of the [petitioner's] vehicle.

Based upon these events, the authorities obtained a search warrant for Thompson's apartment. Director Bishop and officers with the 1st DTF, the Kingsport Police Department, and the Sullivan County Police Department were involved in the execution of the search warrant on April 30, 1998, at 9:00 p.m.

Director Bishop stated that Thompson had a two-bedroom apartment. One of the bedrooms appeared to be a child's room. On the top shelf of the closet in the child's room, officers discovered a cardboard box containing a plastic shopping bag. Inside the shopping bag were several large bags of white powder, two smaller bags of white powder, and two bags of a green leafy substance believed to be marijuana. Director Bishop opined that the white powder was cocaine and he estimated that the bags contained half a kilogram, or 500 grams, of cocaine. On the top shelf of the second bedroom, the officers discovered a small bag containing several plastic sandwich bag "corners" of white powder substance, also believed to be cocaine, which was packaged for resale. The officers also discovered a set of digital scales which Director Bishop explained could be used in the weighing of controlled substances. Additionally, officers discovered more plastic sandwich bags of the type used to package cocaine for resale.

Director Bishop stated that no money was found in Thompson's apartment. Moreover, there were no expensive-looking items in the apartment. Director Bishop concluded that the marijuana discovered was packaged as if for resale and had a street value of $225 or $250. Director Bishop also explained that crack cocaine was typically smoked, but the officers found no device in the apartment for the smoking of crack cocaine. Furthermore, Director Bishop stated that powder cocaine could either be snorted or injected, but no implements for either type of use were discovered in Thompson's apartment. Director Bishop admitted that although various items were checked for fingerprints, "there were no prints developed that were identified [as the petitioner's]." However, there were also no fingerprints which were "identified" as belonging to Thompson or Williams even though they both resided in the apartment.

Agent Denise Buckner with the Tennessee Bureau of Investigation (TBI) crime laboratory in Knoxville testified that she analyzed a portion of the substances obtained by the police during these events. Both the State and the [petitioner] stipulated that Agent Buckner was an expert in drug chemistry. Agent Buckner testified that she analyzed two bags of a substance and determined that it was 53.11 grams of cocaine base, which is also known as crack cocaine.

Next, the State and the [petitioner] stipulated that Agent David Holloway, a forensic chemist with the TBI crime laboratory, was an expert in forensic chemistry. Agent Holloway testified that he analyzed a total of 467.8 grams, or 1.03 pounds, of powder cocaine which was obtained from Thompson's apartment. Agent Holloway also asserted that the green leafy substance weighed 32.46 grams and tested positive for marijuana.

Robbins was recalled to the stand and he testified that Long dialed the same telephone number to obtain the drugs as she had dialed to arrange payment for the

drugs.  Soon after the second telephone call, the [petitioner] arrived at the Revco parking lot.

State v. Marcus Thompson, No. E2001-02521-CCA-R3-CD, 2003 WL 21999376, at **1-5 (Tenn. Crim. App. Aug. 22, 2003), perm. to appeal denied (Tenn. Jan. 5, 2004) (footnote omitted).

The trial court, finding no evidence to support count five, granted a judgment of acquittal for that count.  Id. at *6.  The jury acquitted the petitioner on count four and found him guilty of the following:  "conspiracy to sell and deliver at least twenty six grams but less than three hundred grams of cocaine" (count one); "possession of at least twenty-six grams but less than three hundred grams of cocaine with intent to sell and deliver" (count two); and "sale and delivery of five-tenths gram or more of cocaine" (count three).  Based upon these guilty verdicts, the trial court sentenced the petitioner as a Range II, multiple offender to twenty years for each offense.  Counts two and three were run concurrently with each other but consecutively to count one for a total effective sentence of forty years.[3]  The petitioner, with newly appointed appellate counsel, appealed his convictions, raising numerous issues.  On August 22, 2003, this court affirmed both the petitioner's convictions and sentences on direct appeal, remanding only for a reduction in the amount of fines.  See id. at*21.

Thereafter, the petitioner filed a *pro se* petition for post-conviction relief on February 2, 2004, alleging that both trial and appellate counsel denied him effective assistance of counsel.  On February 25, 2004, post-conviction counsel was appointed, and an amended petition was filed on April 1, 2004.[4]  In his original and amended petitions, the petitioner asserted, among numerous other claims, that trial and appellate counsel were ineffective because they both failed to challenge his presentment for being duplicitous and his jury verdicts for not being unanimous.  He further alleged both counsel were ineffective because they failed to attack the jury instructions as an unconstitutional amendment to the presentment.

---

[3]There is confusion about how the petitioner's sentences were structured.  In his brief, the petitioner claims counts one and two are concurrent with each other and count three is consecutive to count one.  In its order denying post-conviction relief, the post-conviction court stated the same thing.  Even in the petitioner's direct appeal, this court stated that count two was to be served concurrently with count one.  Thompson, 2003 WL 21999376, at *6.  We take this opportunity to set the record straight.  The judgments and the sentencing hearing transcript both clearly state that counts two and three are concurrent with each other, but both are consecutive to count one.

[4]This is not the only amended petition that was filed.  Indeed, the petitioner has proven himself to be a prolific writer, filing, *pro se,* the following:  amended petition on March 11, 2004; amended petition on March 19, 2004; motion to supplement petition on May 13, 2004; amended supplemental petition on June 9, 2004; and "Motion to Alert Court Counsel has been Notified of the Following" on June 28, 2004.  In addition, post-conviction counsel filed a supplement to amended petition on May 25, 2004; and an amended petition for relief from sentence on August 6, 2004.

**Post-Conviction Hearing**

At the October 15, 2004, evidentiary hearing, the petitioner testified that although he thought count three[5] was duplicitous, he never discussed this belief with either trial or appellate counsel. He said he believed he was being convicted "of the two offenses within the single count" and asked trial counsel if he "could be convicted of both but [he] did not know that the correct term for . . . what was going on was duplicitous." He acknowledged that trial counsel had filed a motion to dismiss count three, not for being duplicitous, and the first time the issue was raised was in his post-conviction petition. The jury instructions for count three charged that the jury could find the petitioner guilty of the "sale or delivery" or "both the sale and delivery" of cocaine. The petitioner testified that he never agreed to his presentment being amended but acknowledged he made no objection to the trial court's instructions. The petitioner relies solely on State v. Angela E. Isabell, No. M2002-00584-CCA-R3-CD, 2003 WL 21486982 (Tenn. Crim. App. June 27, 2003), which was decided after he was convicted and sentenced in July 2001, to support his argument that count three was duplicitous and his jury verdict was not unanimous.

The petitioner's appellate counsel testified that he had been in practice for thirteen years and handled approximately seventy-five appeals. Counsel said he met with the petitioner prior to writing the brief to discuss what issues should be presented on appeal. The petitioner requested to see the appellate brief before it was filed so that his "jail house lawyer" could review it. Counsel described his filing as "a pretty extensive brief . . . [with] some forty-some odd pages" and said the petitioner had the opportunity to review the brief and made no objection to it being filed. As for the petitioner's argument that count three was duplicitous and the verdict was not unanimous, counsel testified that he had already filed the petitioner's brief when the Isabell decision was released[6] and that he was not aware of any other cases before Isabell that explained that the sale and delivery of drugs were separate crimes. He also testified that he had reviewed the jury instructions but did not think there was a unanimity problem with the verdict because the trial court instructed the jury they could find the petitioner guilty of "sale and delivery." On cross-examination, counsel acknowledged that he did not raise the question about duplicity on the petitioner's direct appeal.

The petitioner's trial counsel testified that he had been practicing law for thirty-five years and that his practice was almost exclusively criminal law. He explained that he represented the petitioner on drug charges both in state and federal court. Asked about the jury instructions and unanimity of the jury verdict, he testified that he never discussed with the petitioner "what we would now call the Isabell issue" and that he did not think at the time of the trial there was any question about the unanimity of the verdict. On cross-examination, he acknowledged that, although he realized now

---

[5]We note that although he raised numerous issues in his post-conviction petitions, which were thoroughly addressed during his post-conviction hearing, on appeal the petitioner asks only that his conviction as to count three be reversed and dismissed due to ineffective assistance of counsel. As such, we limit our recounting of the post-conviction hearing to testimony concerning count three alone.

[6]We note that appellate counsel filed the brief on August 5, 2002, and the Isabell decision was released on June 27, 2003. The petitioner's opinion was released less than two months later on August 22, 2003.

there was authority that count three of the presentment was duplicitous, at the time of trial the duplicity issue was not "obviously apparent to those . . . who practiced criminal law." Trial counsel testified that he felt like he did everything he could to protect the petitioner's best interest.

The post-conviction court issued a lengthy and detailed order addressing the issues presented by the petitioner. In denying relief, the court found that the petitioner had not proven that trial or appellate counsel was defective:

> The [c]ourt finds that the [p]etitioner has failed to prove by clear and convincing evidence that he received ineffective assistance of counsel . . . at either the trial or appellate level.

> He was represented at trial by [trial counsel], an attorney with many years of experience representing defendants in criminal cases, many of them capital cases. The [c]ourt finds that considering the [p]etitioner has pled guilty in federal court to a charge based on the same allegations contained in Case No. S41,514 and had signed an "agreed factual basis" admitted his guilt, [trial counsel] represented the [petitioner] at trial in an exemplary manner.

> The [p]etitioner presented no credible evidence that the result would have been different in Case No. S41,514 if [trial counsel] had done anything differently.

> The [c]ourt finds that [appellate counsel] presented the issues on appeal in a clear and thorough manner as evidenced by his appellate brief and the appellate court's decision. Again, the [p]etition[er] did not present any evidence that the result would have been any different if [appellate counsel] had presented his case differently.

It is from this order that the petitioner appeals, arguing the post-conviction court erred in finding trial and appellate counsel had not been ineffective as to count three of his presentment. In the alternative, he asks that, under Tennessee Rule of Criminal Procedure 52(b), we find the duplicitous presentment in count three to constitute plain error and, accordingly, reverse and dismiss the count.

## ANALYSIS

### I. Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). When an evidentiary hearing is held in the post-conviction setting, as occurred in this case, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate

the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

## II. Ineffective Assistance of Counsel

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of facts and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

On appeal, the petitioner contends that trial and appellate counsel were ineffective because they failed to raise the issue of duplicity in count three of the presentment, charging him with "sale or delivery" of cocaine, and failed to attacked the jury instructions, which he argues were an unconstitutional amendment allowing "the jury the right to pick and choose offenses from the presentment."

The petitioner relies solely on the Isabell holding to support his argument that count three of the presentment was duplicitous and the verdict was not unanimous. In Isabell, the defendant was charged with "sale or delivery" of a controlled substance and argued the jury verdict finding her guilty of "sale or delivery" of a controlled substance was not unanimous. In reversing the convictions, this court explained:

> The sentencing commission comments following Tennessee Code Annotated section 39-17-417 explain that "[t]he commission wished to make it clear that each of these acts [, i.e. the manufacture of a controlled substance, the delivery of a controlled substance, and the sale of a controlled substance,] was a separate offense." See Tenn. Code Ann. § 39-17-417(a)(1)-(3). Generally, it is impermissible to charge

two distinct offenses in a single count indictment. See State v. Jefferson, 529 S.W.2d 674, 678 (Tenn. 1975). In other words, "all crimes arising from the same incident that are not lesser included offenses of another crime charged in the indictment must be charged in separate counts." State v. Gilliam, 901 S.W.2d 385, 389 (Tenn. Crim. App. 1995). Accordingly, if the indictments underlying the offenses had charged the offenses in separate alternative counts; e.g., count one the sale of crack cocaine, count two the delivery of crack cocaine; the indictment would not be faulty. We agree with the appellant that the indictments impermissibly charged two separate offenses within a single count.

Moreover, in Tennessee a criminal accused enjoys a constitutional right to a jury trial when she faces confinement or a fine of more than fifty dollars. See State v. Lemacks, 996 S.W.2d 166, 169 (Tenn. 1999). "This constitutional right necessarily includes the right to a unanimous jury verdict before a conviction of a criminal offense may be imposed." Id. at 169-70. Notably,

> [q]uestions regarding jury unanimity generally arise in cases where the prosecution presents evidence to the jury that tends to show more than one criminal offense, but the underlying indictment is not specific as to the offense for which the accused is being tried.

Id. at 170. Importantly, the right to unanimity protects against the possibility of a "patchwork" verdict. See State v. Forbes, 918 S.W.2d 431, 446 (Tenn. Crim. App. 1995). In other words, the appellant is entitled to be convicted of the *sale* of a controlled substance or the *delivery* of a controlled substance; she cannot be convicted of the *sale or delivery* of a controlled substance based upon the same set of facts under a single count of an indictment.

Isabell, 2003 WL 21486982, at *3 (emphasis in original).

Unlike in Isabell, the issue here is not whether count three of the presentment was duplicitous or the count three verdict was not unanimous, but whether trial and appellate counsel's failure to address the duplicity and unanimity issues fall "below an objective standard of reasonableness under prevailing professional norms." House, 44 S.W.3d at 515. We conclude that it does not.

The Isabell opinion was released more than two years after the petitioner's trial. On direct examination, trial counsel testified about the duplicity issue thusly:

Q.     Let me ask you, [the petitioner] also raises an issue with regard to the presentment and the way the counts are phrased in each of the three, it uses both sell or deliver. With regard -- you've had a chance obviously to see the jury instructions, remember those.

A.     Right.

Q.     Did you feel that as it was instructed in this case there was a question as to whether or not, and as you understood the law to be at the time of the trial, that there was any question about unanimity of the verdict of the jury at that time?

A.     No, I don't, though I would say I'm confident that I never discussed with [the petitioner] what we would now call the Isabell issue and I suppose if you, if you go back and research the law you certainly can come up to ultimately what the Court of Appeals came up to. You know, it's probably a good decision but, you know, if I should have forseen it then I should have forseen it. I didn't and I'm confident I never discussed that with [the petitioner]. I recall the [c]ourt discussing the jury instructions and that she was going to do it in the way that she did it.

On cross-examination, he further clarified his understanding of the duplicity issue:

Q.     [Trial counsel], I think we all know now at least Count Three is duplicitous.

A.     If it was today, you know, I think we'd certa[inly] be raising that issue or perhaps the State wouldn't even be indicting like that today.

Q.     Correct. And at that time this issue was not really that well known among the trial lawyers here in East Tennessee.

A.     I think that's a correct statement. We all, the word duplicitous certainly isn't a new term and we all understand that but, you know, at that time it certa[inly] didn't seem to be something that was, that was obviously apparent to those of us who practiced criminal law and some smart lawyer came up with the idea and he was representing a fellow by the name of Isabell.

Q.     And generally it was pretty well known that an indictment for receiving or concealing would be duplicitous, right?

A.     Right, have to be separate counts.

Q.     But as far as the drug area that wasn't all that until . . . the Isabell case.

A.     The indictments in the First District, for instance, were drawn just exactly in the same way as they are over here.

Similarly, post-conviction counsel testified about these issues as follows:

-13-

Q.      . . . And also Count Three, knowingly s[ell] or deliver.  And what [the petitioner] I think is alleging through counsel is, is that that was duplicitous. Now, first of all I guess the question that I want to ask is, is that the <u>Isabell</u> case that he referred to was decided in 2003, so at the time you prepared your brief had that case been decided?

A.      No.

Q.      And as far as you knew in your role and having done appellate cases, were you aware of any decisions that had been filed dealing with the fact that the sale and the phrase delivery or the word delivery were actually separate crimes as decided in the <u>Isabell</u> case?

A.      No.

Q.      The other question that I want to ask you then in the -- is the question of, the question of unanimity of the jury in this particular case when they found [the petitioner] guilty in [count three].  You had an opportunity to see the transcript and see the jury instructions, correct?

A.      Yes, I would normally.

Q.      I mean the jury instructions would have been read.  I mean you would have had –

A.      Correct.

Q.      -- the transcript and they would have been read in the transcript.

A.      It's in the record.

Q.      And then you would have also had the record of what the jury found.

A.      Correct.

Q.      And the Judge, in her instruction, told the jury to find either a sale or a delivery or a sale and delivery.  Is that your recollection of her instructions to them[?]

A.      Yes.  Yes, I just reviewed the –

Q.      You reviewed them just a moment ago.

A.      Yeah, yeah, but I wouldn't have recalled, but yes.

Q.      And in each of those cases, and again I think you specifically have a recollection of this, that the jury found both a sale and delivery.

A.      That's my recollection.

Q.      And again, is there anything in your mind that would suggest because the jury found sale and delivery, that there was any question as to the unanimity of the jury in the particular case?

A.      To me I wouldn't have thought of that at the time and wouldn't have addressed it, you know, and the court may say I'm wrong, but I wouldn't have and I guess for years we didn't, so.

Q.      But there's nothing in your mind that causes you to think that the jury might have been looking at a sale or they might have been looking at a delivery because the phrase "and" was included in both the sale and the delivery, their final finding.

A.      I don't think so.

As this uncontradicted testimony at the post-conviction hearing shows, prior to Isabell, duplicity and verdict unanimity with drug offenses indicted in this way were considerations which were not "well-known" by trial attorneys in East Tennessee. Further, the wording of count three was identical to that of similar charges apparently habitually brought in the district. The petitioner has made no showing that these were not true. Accordingly, we conclude that the petitioner has failed to show that trial and appellate counsel's representation fell below any objective standard of reasonableness.

On appeal, the petitioner argues that "both trial and appellate counsel's failure to raise the issue [that the presentment allowed the jury to elect offenses and the jury charge lessened the State's burden and/or alternatively amended the presentment after jeopardy attached without the petitioner's consent] amounted to ineffective assistance of counsel." No references are made to the record showing that this claim was argued to the post-conviction court, nor are any authorities cited for his proposition that the wording of jury instructions can amount to amending a presentment. Accordingly, this claim is waived. Tenn. R. App. P. 27(a)(7).

The petitioner urges us, under Tennessee Rule of Criminal Procedure 52(b), to find that the duplicitous presentment constitutes "plain error." It is true that where necessary to do substantial justice, an appellate court may take notice of a "plain error" not raised at trial if it affected a substantial right of the defendant. Tenn. R. Crim. P. 52(b). This is not, however, the petitioner's direct appeal. This court has previously explained that "the plain error doctrine has no application in post-conviction relief proceedings." Corwyn E. Winfield v. State, No. W2003-00889-CCA-R3-

-15-

PC, 2003 WL 22922272, at *5 (Tenn. Crim. App. Dec. 10, 2003), perm. to appeal denied (Tenn. May 10, 2004); see also State v. West, 19 S.W.3d 753, 756-57 (Tenn. 2000). We conclude, therefore, that the petitioner is not entitled to plain error review of the possible duplicitous nature of count three of his presentment.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition.

_____
ALAN E. GLENN, JUDGE